# United States Court of Appeals
## For the First Circuit

No. 13-2011

NICOLE PONTE,

Plaintiff, Appellant,

v.

STEELCASE INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,[*] Associate Justice,
and Selya, Circuit Judge.

John A. Markey, Jr., with whom Moses Smith & Markey, LLC was on brief, for appellant.
Tracy Thomas Boland, with whom Morgan, Brown & Joy, LLP was on brief, for appellee.

January 31, 2014

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**LYNCH, Chief Judge**.  Nicole Ponte appeals from the district court's grant of summary judgment in favor of her former employer, Steelcase Inc., on her claims under Title VII, 42 U.S.C. § 2000e et seq., and Mass. Gen. Laws ch. 151B that (1) she was subject to sexual harassment while employed there, and (2) she was terminated in retaliation for her reports of such harassment.  We apply the but-for causation standard announced in University of Texas Southwestern Medical Center v. Nassar, 133 S. Ct. 2517 (2013), to plaintiff's Title VII retaliation claim.  We affirm.

I.

Because this appeal is from entry of summary judgment, we recite the facts in the light most favorable to Ponte, and also rely on undisputed material facts.  See Winslow v. Aroostook Cnty., 736 F.3d 23, 24 (1st Cir. 2013).

Steelcase is a Michigan company that manufactures furnishings and sells a variety of workplace products and services; its sales are primarily conducted through its dealers, who are effectively Steelcase's clients.  Steelcase, for its healthcare division, hired Ponte in mid-June 2010 as an Area Manager in New England, and she was employed there for less than a year, until May 27, 2011.  Ponte was the only Area Manager for the New England region.

Robert Lau, the Regional Manager for Eastern Area Healthcare Sales, hired Ponte and was her direct supervisor

-2-

throughout.[1]  Lau and Ponte both worked for Nurture, Steelcase's healthcare division, but Lau was based in Kentucky while Ponte was based in Boston.  Lau reported directly to Kyle Williams, head of Nurture.

Lau instructed Ponte to spend her first ninety days at Steelcase completing her training, "listening and learning," and building her relationships with her three key dealers: Susan Hughes at Office Environments of New England ("OENE"), Suzanne Ludlow at Business Interiors, and Edward Kuchar at BKM.

Ponte's performance problems began almost immediately. In June 2010, Mary Chestnut, Ponte's Human Resources contact, noted that she had received feedback from another Steelcase employee that Ponte was having "more issues" with the initial "on-boarding" process than other recent hires.

Early on, Lau received sua sponte complaints about Ponte from one of her dealers.  On July 8, 2010, after Ponte failed to attend a meeting at OENE that she had said she would attend, Susan Hughes emailed Bob Kelly, the CEO of OENE, to detail that episode and to outline her general problems with Ponte's early performance. In the three weeks that Ponte had been working, Hughes found her to

---

[1]  There were Area Managers in the other regions of the country.  Area Managers are responsible for maintaining existing relationships with key regional dealers and for advancing sales of Steelcase products in their regions.  Lau also supervised Area Healthcare Managers from ten other regions on the East coast, in addition to Ponte.

be "too impulsive, making assumptions, not following through on what she says she will do, and not planning ahead or communicating well." There had been "little or no prep for any meeting I have attended with her." On July 15, CEO Kelly forwarded this email to Lau.

<u>Two Incidents Alleged to Be Sexual Harassment</u>

Soon after Hughes's July 8 email, Ponte attended training at Steelcase headquarters in Grand Rapids, Michigan. A portion of the training was specific to Nurture employees, while another portion of it was part of a more general "Escalate" training program, received by all Steelcase sales employees. After training ended one evening, Lau, Ponte, and two other trainees went out for dinner. Following dinner, though Ponte was set to go back to her hotel with the other trainees, Lau was "persistent" that Ponte join him in the car so that he could drive her back to her hotel. Of the three trainees, Ponte was the only one who reported to Lau. The other two trainees, Robin Goldhawk and Jared Mejeur, reported to Benjamin Pratt, Lau's West coast counterpart. During the roughly fifteen-minute drive to the hotel, Lau reached his arm around Ponte's seat to put his hand on her right shoulder, and left his hand there for about a minute. During that ride, he emphasized

to Ponte that he had done a lot to get her this job, and that she owed him to do "the right thing by him."[2]

Ponte recounted the events of the car trip to Goldhawk and Mejeur. Mejeur testified that Ponte said she "had an interesting car ride back to the hotel" and that she had felt "taken aback" by Lau's actions. Goldhawk testified that Ponte said "something like Rob hit on her," but reported it to Goldhawk on a different evening.

Later during Ponte's training in Grand Rapids, she and Lau attended a dinner with a different group of Steelcase employees. Lau again insisted on driving Ponte back to her hotel, over her insistence that she had a ride with other trainees.[3] During this drive, Lau again reached his arm around Ponte to rest his hand on her shoulder, and kept his hand there for the majority of the fifteen- to twenty-minute drive back to the hotel. She did not request that he remove his hand. Ponte did not report this incident to her peers. Nor did she report either incident at the time to Steelcase supervisors. Lau's actions during the two car

---

[2] Lau admits that he drove Ponte back to her hotel on one occasion, however he denies putting his arm around Ponte and making comments implying that she owed him for the role he played in getting her the job. Lau later testified that he wanted to "understand how the training [was] going, how the class [was] going, . . . [was] she comfortable with the company and the culture." Because we view the facts in Ponte's favor, we assume that these events transpired as she describes.

[3] Lau denies that a second car ride with Ponte took place. Again, we assume it did.

-5-

rides are the only incidents on which Ponte's sexual harassment claim rests.

After the training in Grand Rapids, on July 23, 2010, Lau sent Ponte a brief email, and told her that he had received "[p]ositive feedback" from Hughes at OENE. Lau also arranged for John Curry, a Steelcase Regional Sales Manager based in Boston, to meet with and coach Ponte.[4]

Four days later, on July 27, Ponte called Chestnut in Human Resources and expressed concerns about losing her job, explaining that she had both been late to and not prepared for a meeting with the CEO of OENE. This was separate from her earlier failure to show up at the OENE meeting with Hughes. Chestnut told Ponte that Ponte's performance was "not meeting expectations," and that Ponte needed to discuss that with Lau. Chestnut offered to be a part of any such meeting, but Ponte declined the offer. Ponte does not claim to have told Chestnut in this call about the two incidents or to have made any assertion of improper conduct by Lau.

Ponte does not dispute that she and Lau had weekly phone calls beginning in August 2010, in which Lau provided Ponte with coaching and support, though Ponte's later view was that these calls were insufficient. The calls continued until the end of Ponte's employment. Also, in August 2010, Lau arranged for Brenda

---

[4] In this email, Lau also informed Curry that Ponte had said her mother was suffering from "stage 4 cancer."

-6-

Brewer, a Regional Performance Consultant, to assist Ponte in her professional development.

Months later, Ponte called Chestnut to report she was having problems with Lau. She does not give a date or offer a record of the call, other than she recalled it being in February or March 2011. It is this phone call that Ponte relies upon as the protected activity of reporting harassment for which she was allegedly terminated in May 2011. Ponte told Chestnut that she perceived a lack of support from Lau, and that she "thought a lot of it was related to something that happened in July." Ponte testified that she "didn't go into detail" about the July incidents. She did not characterize them as sexual harassment. She did say that she was "in a position with Rob [Lau] where [she] was alone [on] a couple of occasions and [] was made to feel uncomfortable." But Ponte also told Chestnut that she did not want to pursue this issue. She told Chestnut that she "didn't want to get anybody in trouble but [] felt that it was still impacting" her performance. This call was seven or eight months after the July events.

Chestnut testified that she did not recall the specific call Ponte recounted. However, she noted that when Ponte did call Chestnut, it was to explain personal issues regarding Ponte's mother's illness, and "not about anything going on at work." We take as true that the call was as Ponte has recounted.

On March 2, 2011, Suzanne Ludlow of Business Interiors, another one of Ponte's three major dealers, emailed Lau to express several concerns and complaints about Ponte's job performance to that point. Ludlow also noted in the email that she had spoken to Hughes, Ponte's main dealer at OENE, about Ponte and that the two were "on the same page."

In response, Lau spoke with Ponte the next day about Ludlow and Hughes's complaints. On March 11 Lau emailed his notes about the meeting with Ponte to himself and to Chestnut in Human Resources. The notes say Lau covered with Ponte the complaints he had received from the dealers, reminded Ponte of the crucial importance of clear communication, and set out a series of expectations for her going forward. He also noted that Ponte stated she felt there was "no basis" for the dealers' concerns. Ponte did not deny these complaints were made, and does not deny the conversation with Lau.

On March 11, Ponte and Lau had another phone conversation. She said that she had learned that morning that she had skin cancer. She also said that she had been an hour late for her meeting with Hughes at OENE, due to traffic. Though Ponte said that she had called Hughes to let her know she would be late, Hughes was upset and did not want to speak with Ponte after she was an hour late. Lau's own notes on the conversation state that his

expectation was that he and Ponte were to "make this work" with OENE.

Also on March 11, 2011, Lau forwarded to Chestnut two of his earlier emails about Ponte from late July 2010. Ponte argues that Lau began forwarding these emails to Chestnut only after Ponte spoke to Chestnut in February or March about Lau, but the record is inconclusive as to timing. By contrast, Steelcase contends that Lau began forwarding these emails to Chestnut when he was preparing Ponte's annual performance review for the period ending on February 28, 2011 and it was clear that the review would be negative. Steelcase's evidence is that Lau's standard practice was to inform Human Resources in advance of giving an employee a negative review. There is no evidence to the contrary.

On March 21, Ponte engaged in an email colloquy with Ludlow and Gary Lague from Business Interiors, one of Ponte's main dealers, about an order for several types of furniture for an office. Ponte provided listings and price information for furniture. In response to a question about whether bed headboards were available, Ponte responded: "Just heard from a colleague that headboards CAN be ordered through specials. So, you may want to get a quote prior to the meeting Thursday." Ludlow forwarded Ponte's response to Lau and said that she was concerned because it "appears [Ponte] is taking the word of colleagues" and was not sure whether her own company carried this product. Ludlow said she

"automatically see[s] a red flag here." Lau then followed up with Ludlow immediately to provide the information Ludlow requested.

A week later, presumably after Lau and Ponte had spoken to discuss Ludlow's concerns, Ludlow emailed Lau to report positively on a client meeting that she had attended with Ponte. Ludlow noted that Ponte was "prepared and ready" for the meeting and that they were "on the right track."

Annual Performance Review Process and Aftermath

On April 21, the day before Ponte was scheduled to have her performance review with Lau, she sent Chestnut, at about 8:30 p.m., an email requesting a personal day the next day (April 22) to be with her mother, who had been hospitalized. That request was granted, so Ponte's performance review did not take place on April 22, as planned.

In her email, Ponte also wrote:

> I enjoy my job thoroughly and I feel since coming back from the sales meeting in March, that I have been able to work strategically and begin to build the necessary relationships that are essential to be successful. I have several projects that I have been working on and had a recent win.

She went on to note that she knew that Lau "continually talks about [her] communication problems," but that she felt "he is not aware of the complexities of this territory and some of the historically difficult personalities that exist and have been discussed by other Steelcase employees." Ponte expressed regret about her tardiness

-10-

to meetings, and also noted her perception that, as a general matter, she did not have Lau's support. She stated that "it seems like I am continually asking him for support by the weekly phone calls and requests for a territory visit." Her email concluded:

> I am taking your advice and listening to Rob's [performance] assessment despite my strong feelings about him. I know that you keep telling me that I am the only one that has a problem with Rob, but again, I am not a veteran who feels his remarks and the turnover at Nurture is so high that they hope not to deal with him very long.

It also said: "I ask that you do not share this letter with Rob for fear of any sort of actions he might make towards me. It is clear to others and to me, he wants me out of the organization and will make his word believable."

Chestnut testified that in response to this email she communicated to Ponte that she, Chestnut, could not move forward with any kind of complaint or action if Ponte told her not to reveal the information. Chestnut also explained to Ponte that the company had "other avenues of communicating if [Ponte] has any concerns, because [Chestnut] did not understand what [Ponte's] concerns were." Chestnut reminded Ponte that Steelcase had a "Global Integrity Hotline" that employees could call to report problems, and that Kyle Williams, Lau's supervisor, was also available to Ponte. Ponte does not dispute Chestnut's account. Ponte never called the company's hotline and did not contact

Williams about Lau until almost a month later, when the decision to terminate her employment had already been made.

Also on April 21, Lau forwarded to Chestnut an email that he had sent to himself a few minutes earlier, about two hours after Ponte emailed Chestnut. The Lau email covered further performance problems that he was having with Ponte. Specifically, after Ponte had expressed to him her view that Lau was not supporting her, he responded that he was going behind the scenes to ask the dealers to continue to give Ponte a chance in her role, and that they would be discussing these issues in her performance review. He also voiced his concern that she was not a good fit for her role, and that they "need[ed] to work through this."

Ponte contends that because Lau forwarded this email to Chestnut less than two hours after Ponte emailed Chestnut regarding Lau, it supports the inference that Lau "knew" Ponte was "speaking to Human Resources," and this supports her claim of retaliation. However, there is no evidence that Chestnut ever disclosed to Lau the content of Ponte's April 21 email, and Chestnut denies she did so. Lau had begun forwarding his notes about Ponte to Chestnut over a month earlier, on March 11.

Ponte took her requested personal day on Friday, April 22, postponing her performance review. On the following Monday, April 25, Lau forwarded Ponte's formal performance review to Kyle Williams, his supervisor, and explained that Ponte had not been

-12-

able to have her performance review on the scheduled date because of her mother's illness.

As Ponte's direct supervisor, Lau prepared her MAPP review[5] and provided it to her. That formal review, for the period ending on February 28, 2011,[6] gave Ponte an overall rating of "Below Performance Expectations," and in each subcategory she was rated as "Below Objective" or "Development Need." The evaluation noted that there "have been consistent concerns from a variety of professionals regarding Nicole's clarity of communication, meeting commitments . . . being on time, organizing, and ability to prioritize to become more effective." In the sales portion of her review, which counted for 40% of the overall evaluation, Ponte's review was poor: the sales plan for the region was $1.965 million, and only "$680k" of those sales were realized. The evaluation notes that Steelcase will "evaluate this [employee situation] closely [over the] next 30 days."

---

[5] The formal review process for Area Healthcare Managers is based on a Measurable Annual Performance Plan (MAPP). The MAPP is based in part on the employee's measurable sales objectives, and is shared with each employee at the start of the year so that they are aware of their goals. The formal MAPP performance review document is uniform across Area Healthcare Managers. Once the manager has completed the review, it is shared with the employee; in order for the review to be marked as "complete" in Steelcase's online review system, both the manager and the employee must sign off on it.

[6] Steelcase's MAPP process runs on an annual schedule beginning each year in March. Ponte began working at Steelcase in the middle of the 2010-2011 MAPP year, so her evaluation did not span a full twelve months.

After reading her evaluation,[7] Ponte emailed Lau on April 25, 2011, and stated that she "felt as though there were not any surprises from our weekly discussions."  Ponte's email said that she "appreciate[d] the trust and the risk [Lau] took" in hiring her, and reiterated her commitment to improving in her job. Finally, Ponte reviewed some of the details for Lau's upcoming visit to the New England region and concluded: "I thoroughly enjoy when you come out to the territory and look forward to your trip here."

On May 4, Ponte and Lau were communicating via email with Jim Maguire, a dealer from Office Concepts.  In response to a direct request, Ponte sent a number of sales figures.  Maguire replied to both Ponte and Lau that the figures were incorrect and inapplicable to his company.  Lau responded solely to Ponte: "Not good to share wrong information.  Please correct."  Ponte then corrected her error and re-sent the corrected information soon after.

Lau visited the New England region and met with Ponte on May 12 and 13.  Ponte was responsible for planning the visit. Afterward, Lau emailed notes to himself that his visit was poorly organized, and that he had told Ponte that it could have been done

_____

[7]  The record is silent on how Ponte received her review; however, Ponte's April 25, 2011 email to Lau stated that she "checked the appropriate box on the MAPP [Fiscal Year] [20]11 acknowledging we reviewed the appraisal together."  We assume that she reviewed the document electronically.

in one day instead of two. Lau's notes also state that he thought her ability to "lead the sales effort [was] questionable," and that she was "playing a support role" and "not proactively targeting accounts." Lau testified that the May visit was when he began seriously considering terminating Ponte's employment.

Termination of Ponte's Employment

Lau made the ultimate decision to terminate Ponte's employment, in consultation with others, as is normal Steelcase procedure. He did so after consulting with his supervisor Kyle Williams, with Human Resources, and with the company's legal department. By May 2011, Chestnut had moved to a different role within the company, and she was replaced in Human Resources by Dawn Waalkes.[8] Ultimately, Lau concluded, with Williams' full support, that Ponte's performance continued to be unsatisfactory and that the best course of action was to terminate her employment.

By May 20, 2011, Ponte had been notified that Lau and Waalkes were traveling to Boston to meet with her on May 27. She then emailed Williams to request a phone conversation with him; she stated that she had reached out to Chestnut and others about her "concerns about Rob" and that she "shared what happened with Robin [Goldhawk] and Jared [Mejeur] about some private issues that

_____

[8] Before the decision to terminate Ponte's employment was made final, Waalkes consulted with Chestnut regarding Ponte's history at Steelcase. Chestnut testified that she spoke to Waalkes about Ponte, but that she did not participate in any conversation at which the final decision about termination was made.

-15-

happened."  She again did not describe any sexually harassing conduct.

Williams forwarded this email to Waalkes, who responded that Ponte had also called her on May 20.  Waalkes's view was that Ponte offered "a lot of excuses and blaming of others for things that haven't gone well."  Ponte had given Waalkes a list of people who Ponte felt would corroborate her view.  The list included Ludlow, who had previously criticized Ponte's work, but not Goldhawk or Mejeur.

A few days later, on May 24, Ponte emailed Lau, Waalkes, and Williams asking for advance information as to her upcoming meeting with Lau and Waalkes.  Specifically, she requested a short agenda identifying the most important issues and incidents that were to be discussed.  She also asked that she be permitted to tape record the meeting so that she would be able to "accurately recall and understand the feedback" provided.

In response to this email, also on May 24, Williams emailed Waalkes and Lau to ask whether, given these emails, Ponte's "tone of surprise[,] and the current lack of an immediate replacement," Steelcase was "rushing this termination."  Williams clarified that he did not disagree with the decision to terminate her.  Waalkes responded about an hour later and stated that after consulting with Chestnut and Lau, she was "convinced this [wa]s the appropriate next step."

-16-

On May 27, Lau and Waalkes met with Ponte and terminated her employment. Lau informed her that "things weren't working." The formal exit document she was given stated that the reason for her termination was her unacceptable level of sales performance. After Lau left the room, leaving Waalkes and Ponte alone to deal with various Human Resources matters, Ponte did not mention any incidents of sexual harassment.

After her termination, Ponte filed suit in Massachusetts Superior Court for Suffolk County on December 12, 2011, asserting claims of sexual harassment and unlawful retaliation under both Title VII and Massachusetts General Laws Chapter 151B. Steelcase removed the case to federal court on diversity grounds. Steelcase moved for summary judgment on all counts at the close of discovery. On July 25, 2013, the district court granted the motion in full, and this appeal followed.

## II.

Our review of the district court's grant of summary judgment is de novo, and we draw all reasonable inferences in favor of the nonmoving party. Bose Corp. v. Ejaz, 732 F.3d 17, 21 (1st Cir. 2013). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Cortés-Rivera v. Dept. of Corr. & Rehab. of the Comm. of P.R., 626 F.3d 21, 26 (1st Cir. 2010).

A.          Sexual Harassment and Hostile Work Environment Claim

Ponte argues that the district court erred in concluding that no reasonable juror could conclude that the two incidents were severe or pervasive enough to create a hostile work environment.[9]

To prevail on a hostile work environment claim, a plaintiff must establish:

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007) (quoting Crowley v. L.L. Bean, Inc., 303 F.3d 387, 395 (1st Cir. 2002)).  For brevity, we will assume that Lau's conduct in the two car rides with Ponte satisfies the first three elements of the test.  Surely a new female employee feeling her supervisor's unwelcome arm around her shoulder as he insisted on driving her

---

[9]      While Ponte brings claims under both Title VII and Massachusetts state law, she does not argue that the two claims should be treated differently.  The Massachusetts Supreme Judicial Court has said that it is "our practice to apply Federal case law construing the Federal anti-discrimination statutes in interpreting G.L. ch. 151B."  Wheatley v. Am. Tel & Tel. Co., 636 N.E.2d 265, 268 (Mass. 1994); see also Bourbeau v. City of Chicopee, 445 F. Supp. 2d 106, 111 (D. Mass. 2006).

alone back to her hotel after work would feel very uncomfortable. However, discomfort is not the test. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (noting that Title VII was not intended to be a "general civility code" for the workplace).

The factors we review in assessing whether harassing treatment meets the "severe or pervasive" standard include "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013). There were two occasions of inappropriate behavior in July 2010; Goldhawk, Ponte's peer, described Ponte's assessment as an incident of Lau "hitting on" Ponte. While his physical contact with Ponte was inappropriate, as was the subtle hint that she owed Lau for hiring her, it ended quickly. In the next ten months Ponte did not experience any other inappropriate or harassing conduct, although Lau was physically present with her on more than one occasion. Nor did any of his communications by email or phone contain any harassing language. Lau's objectionable conduct was not pervasive by any measure.

It is true that isolated incidents may, "if egregious enough, suffice to evince a hostile work environment." Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005). But here, Ponte does not show that her contact with Lau in Grand Rapids was

-19-

egregious, or so egregious as to evince a hostile work environment. It was not severe enough to cause her even to use the term "sexual harassment" in complaining about it to Chestnut months later.  On the scale of what has been recognized as egregious conduct rising to the required level, this was not close.  See, e.g., Oncale, 523 U.S. at 77, 81 (holding that a male employee working on an oil platform had a cause of action for a hostile work environment against his male coworkers who subjected him to "sex-related, humiliating actions" and threatened him with rape); Billings v. Town of Grafton, 515 F.3d 39, 47-50 (1st Cir. 2008) (reversing a grant of summary judgment in favor of employer on a hostile work environment claim where supervisor repeatedly and egregiously stared at a female employee's breasts on many occasions over a multi-year period); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002) (affirming jury finding of a hostile work environment where female plaintiff was subject to "harassment on a daily basis, including humiliating sexual remarks and innuendos," for over a year); Crowley, 303 F.3d at 397 (affirming Title VII judgment in favor of female employee where a four-month period of a coworker's unwanted touching and innuendo culminated in his breaking into the employee's home and accosting her); O'Rourke v. City of Providence, 235 F.3d 713, 718-20 (1st Cir. 2001) (reinstating a hostile work environment verdict in favor of fire department's first female firefighter where one coworker

"constantly discussed sexual positions and oral sex," and another "blew in her ear, rubbed his cheek against hers, and stood over her with their bodies squarely touching as she made copies," among other things).

No reasonable jury could conclude that these incidents "amount[ed] to a change in the 'terms and conditions of employment,'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), or created a hostile work environment. The record does not support a finding that the two incidents interfered with Ponte's job performance. At most, Ponte testified that Lau's behavior

> [i]mpacted the relationship that I feel I needed to have in this role. I know that in this role that it was a big opportunity with a lot of responsibilities that I know I needed coaching in. . . . Because we didn't have a good relationship that ultimately impacted my role and my performance.

This does not state a claim that harassment interfered with her performance. What she refers to as a lack of a good relationship is not, on the record, tied to any harassment. Cf. Pomales v. Celulares Telefónica, 447 F.3d 79, 84 (1st Cir. 2006) (affirming summary judgment where there was no evidence that the complained of conduct negatively affected the plaintiff's ability to perform her job functions).

Summary judgment is an "appropriate vehicle for 'polic[ing] the baseline for hostile environment claims.'" Id. at 83 (alteration in original) (quoting Mendoza v. Borden, Inc., 195

-21-

F.3d 1238, 1244 (11th Cir. 1999) (en banc)). Ponte's claim falls below our established baseline, and we affirm the district court's grant of summary judgment in Steelcase's favor.

B.        Retaliatory Termination Claims

Ponte's second claim is that her termination was, rather than a result of her performance problems, a retaliatory response to her complaints to Chestnut about Lau. The Supreme Court recently held as to Title VII retaliation claims that "[t]he text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013). It rejected the less stringent standard that the plaintiff must show only that retaliation was a "motivating" factor. On this record, no reasonable factfinder could reach the conclusion that this but-for standard has been met.

Retaliatory termination claims based on circumstantial evidence are evaluated using the McDonnell Douglas burden-shifting framework. Gerald, 707 F.3d at 24. To make a prima facie showing of retaliation, the plaintiff must show that she engaged in protected conduct, that she suffered an adverse employment action, and that a causal nexus exists between the protected activity and the adverse action. Id. There is no question that Ponte suffered

an adverse employment action; we address the other requirements in turn.

Ponte argues that her February-March 2011 phone call to Chestnut saying she was uncomfortable with Lau's behavior was protected conduct, as the call contained what a factfinder could conclude was an implicit complaint of harassment.[10] The call, which came several months after the incidents, was far from a clear complaint about harassing behavior. See Fantini v. Salem State Coll., 557 F.3d 22, 32 (1st Cir. 2009) ("The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." (quoting Cruz v. Coach Stores Inc., 202 F.3d 560, 566 (2d Cir. 2000)) (internal quotation marks omitted)). But Ponte's report to Chestnut did not "go into detail" and did not indicate that she felt she had been sexually harassed. We are doubtful that she engaged in protected conduct, but we do not rest on that ground.

Even assuming that Ponte's call to Chestnut constituted protected activity, Ponte has failed to make a prima facie case.

---

[10] In her brief, Ponte also attempts to characterize her April 21 email to Chestnut as protected conduct, but that email does not qualify. It does not complain of sexual harassment at all. The conduct complained of in that email -- a lack of support from Lau, her superior -- is not prohibited by Title VII, 42 U.S.C. § 2000e-(3), or by chapter 151B of the Massachusetts General Laws. See Walker v. City of Holyoke, 523 F. Supp. 2d 86, 113 (D. Mass. 2007) (noting that conduct is not protected in a retaliation context where it does not allege an employment practice prohibited by either statute).

A reasonable factfinder could not find there was a causal nexus between Ponte's vague statements to Chestnut and the termination of her employment in May 2011. Ponte argues that the relatively short period of time between her February-March 2011 call to Chestnut and her termination in May 2011 supports the inference that this report caused her termination. "[C]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'" Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (second alteration in original) (quoting Soileau v. Guilford of Me., Inc., 105 F.3d 12, 16 (1st Cir. 1997)). Here, the larger picture quite clearly undermines Ponte's claim.

First, it is noteworthy but not itself conclusive that Ponte's performance problems began before the harassing incidents took place. Before her training in Grand Rapids, Ponte's trouble getting up to speed internally was noted by Mary Chestnut of Human Resources. Indeed, one of Ponte's main dealers, Susan Hughes of OENE, complained about Ponte's performance as early as July 8, 2010.

Second, the complaints about Ponte's performance came from people other than Lau, from men and women who worked directly with her. Nor did the complaints go only to Lau. They went also to Chestnut. In fact, Lau arranged for Ponte to get performance assistance from Brenda Brewer and John Curry. There is no evidence

-24-

that Lau, who seldom saw Ponte face-to-face and who communicated with her primarily via phone and email, prevented Ponte from performing well in her job.

Further, Ponte admitted she had failed often and was having problems performing her job. As early as her July 27, 2010 call with Chestnut, she indicated an early concern about losing her job and recounted an instance where she was late to and unprepared for a meeting with OENE's CEO. Nine months later, Ponte emailed Lau that based on their weekly conversations, she "felt as though there were not any surprises" in her negative performance review. As to timing, her performance review advised Ponte that her situation would be monitored "closely" over the next thirty days. Her employment termination was roughly one month later.

In that month, she did not redeem herself. Ponte made a mistake with a dealer when she sent him incorrect sales information, as the dealer pointed out to her and Lau. Furthermore, others aside from Lau shared the view it was time to terminate her employment. Lau's supervisor Kyle Williams signed off on the decision, as did Waalkes from Human Resources, as did Steelcase's legal department.[11] After consulting with Lau and

---

[11] The retaliating party must be aware of the protected activity that he is believed to be retaliating against. See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013). Ponte urges us to find it reasonable to infer Lau's awareness of these specific reports from the fact that Lau told her that he knew she was speaking to Human Resources. The record does not support such an inference, as Chestnut denied relaying Ponte's complaints

-25-

Chestnut, Waalkes was "convinced" that termination was the correct course of action.

Even if she had made a prima facie case of retaliation, which she did not, Steelcase met its burden to establish a "legitimate, non-retaliatory" reason for the termination, so the final burden rests with Ponte to show that this proffered reason was mere pretext. Alvarado v. Donahoe, 687 F.3d 453, 458 (1st Cir. 2012) (quoting Roman v. Potter, 604 F.3d 34, 39 (1st Cir. 2010)) (internal quotation mark omitted). She has not met this burden.

The pretext inquiry focuses on the employer, and whether the employer believed that its stated reason for the termination was credible. See Meléndez v. Autogermana, Inc., 622 F.3d 46, 53 (1st Cir. 2010). For a plaintiff to "impugn the veracity" of the employer's proffered reason is insufficient; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a "sham" intended to cover up the employer's true motive. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991). Ponte falls well short of this threshold, for the reasons we have amply discussed.

Ponte makes a pretext argument that the "$680k" of sales she was credited with in her evaluation was artificially reduced

---

about Lau to Lau. Regardless, such an inference would not, on this record, meet the causal standard.

for the purpose of her evaluation, and that her region's sales in fact totaled $1.23 million. Steelcase provided unrebutted evidence that the difference between the $680,000 and $1.23 million was due to a standard adjustment to Steelcase's regional sales numbers due to a dealer called "Fens." Fens is a dealer with locations in North Carolina, Atlanta, and upstate New York, but it places all of its orders through Boston. As a result, all of the Fens sales are initially credited to the New England region. Later, the sales credits are reallocated to the regions to which the Fens orders actually ship, and the Boston sales totals are reduced accordingly. This is a reasonable business practice and not evidence of retaliatory application of its rules. The evidence is that Ponte and her peers in other regions understood this policy, and that all of the relevant sales data was available to them. Ponte did not object to the "$680k" figure at any point during the evaluation process. Ponte does not deny this.

### III.

We _affirm_ entry of summary judgment. Costs are awarded to Steelcase.