UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Athey and White
Argued by videoconference


TODD ALLAN PEGG

                                              MEMORANDUM OPINION[*] BY
v.        Record No. 0879-24-3               KIMBERLEY SLAYTON WHITE
                                                    JULY 8, 2025
BOARD OF VISITORS OF VIRGINIA
  MILITARY INSTITUTE


FROM THE CIRCUIT COURT OF ROCKBRIDGE COUNTY
Christopher B. Russell, Judge

Thomas E. Strelka (Virginia Employment Law, on briefs), for
appellant.

Muhammad Umar, Assistant Attorney General (Jason S. Miyares,
Attorney General, on briefs), for appellee.


In July 2021, Colonel Todd Allan Pegg temporarily left his employment at VMI to deploy

for a year pursuant to his service obligations as a member of the U.S. Army.  Prior to deploying, he

filed a complaint with VMI alleging that his new supervisor was upset at his upcoming departure,

but Pegg did not request that VMI investigate the allegation any further.  He returned from

deployment in June 2022 and asked to be reemployed as provided by USERRA, a federal statute

that protects the rights of returning servicemembers to be promptly reinstated into a position similar

to the one they held before deploying.  Pegg requested a start date in mid- to late-July 2022.  VMI

offered Pegg his former position on July 15, but Pegg declined it, citing his concerns about his

supervisor's allegedly threatening behavior the previous year.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Pegg sued for discrimination and retaliation under USERRA based on the supervisor's pre-deployment conduct and the way in which VMI temporarily replaced Pegg while he was away. The trial court granted summary judgment to VMI on both claims after finding no dispute of material fact that would justify submitting his claims to the jury. On appeal, Pegg argues that this was error because there is a jury question in whether the offer of reemployment was prompt and valid. We disagree and affirm.

BACKGROUND

In 2021, Todd Allan Pegg was the Deputy Commandant for Operations, Plans and Training at the Virginia Military Institute ("VMI"). He is also a Colonel in the U.S. Army and a uniformed services member. In June 2021, the U.S. military notified him of his forthcoming active deployment in Iraq beginning two weeks later. Pegg informed VMI that he would have to be placed on "unpaid military leave" in July due to his upcoming deployment. He stated that he expected his deployment to finish "in early to mid-July of 2022" but would give more details about returning to work as the time approached. In response to Pegg's upcoming deployment, VMI created an advertisement to hire a replacement for his position.

I. Pre-Deployment Emails and Alleged Retaliation

On July 2, Pegg emailed VMI HR expressing concern that the replacement ad appeared to seek a "normal fulltime replacement" for his position rather than a "one-time one-tour position with a limited timeframe." He warned that applicants might "think they are applying for a conventional position when VMI is actually looking for" a "short-term hire." He wrote, "I suspect this ad will both miss some otherwise good candidates, and also garner applicants who would not apply for the vacancy if it were accurately described." Pegg later specified that the replacement ad was posted using an old position description that "advertised a conventional" position "entitled to the standard renewal protections," rather than a temporary position.

Pegg's supervisor, newly hired Commandant of Cadets Adrian Bogart, replied to Pegg's email the same day. He assured Pegg that the replacement ad's "hire will be under a one-year contract" with a "defined term." He also reminded Pegg that he has "reemployment rights" and that VMI would "stay close with . . . [his] desire to return to the same position [he is] departing, or another position equal in pay, rank and authority which could be more appealing for [him]." Bogart concluded by stating that there are "other reasons" for the replacement ad's language and inviting Pegg to "come by to discuss" his concern further.

Pegg's pleadings assert that he informed Bogart of his upcoming deployment in early July in a contentious one-on-one meeting. At the end of the meeting, Pegg alleges that Bogart "threatened him with retaliation" if he deployed, stating that he "know[s] people all over the Army" and would call "'[Pegg's] boss's boss's boss' in order to not 'put up with some colonel.'" He alleges that Bogart threatened his "livelihood and retirement benefits with claims of undue influence over both the military and VMI, including the Army G1 responsible for all pay, promotions and retirement functions and the senior officers [under whom] Col. Pegg was about to be assigned" during his deployment in Iraq. Bogart allegedly "made it clear" to Pegg that he "would not be welcomed back" to his position if he deployed. Pegg was "stunned" by Bogart's hostility, not having met any difficulty in past instances in which he had deployed while working at VMI.

## II. Pegg's IG Complaint

On or before July 8, Pegg went to VMI's Office of Inspector General to share "some concerns" about Bogart, and the IG took notes. The IG notes record that Pegg "stated he did not expect an investigation or desire a remedy," noting that he had once been a candidate for Bogart's position and worried about being seen as vengeful. The notes say that Pegg came forward because "other employees in the Commandant's Office are also feeling threatened by

recent remarks made by" Bogart but were afraid to voice their concerns since Bogart had allegedly made "statements about using his influence to harm the careers of his subordinates."

According to the IG notes, Pegg described a two-hour meeting Bogart had with the Commandant's staff in which he "presented his plan to restructure everyone's job to reflect an Army model." Pegg stated that Bogart "shut down" staff members' questions and suggestions about the plan. He also stated that, "[l]ater, in a private discussion in . . . Pegg's office," Pegg tried to discuss his concerns about the Army model plan with Bogart, who "responded by telling him he was a close personal friend of the Army G1 and [that] a phone call to him would ensure that he . . . did not need to listen to some Colonel [i.e., Pegg] tell him what he can and cannot do." Pegg "expressed concern regarding the lack of open communication, trust, and the effect this is having on morale." The IG notes further state that Pegg "became concerned when he saw his job being advertised on the HR Webpage." He had been told by HR that his position would only be "temporarily" filled, but Bogart told him that he had ordered changes to the replacement ad, for which "no further discussion was warranted." Pegg stated that "he intends to return to VMI and join the Commandant's staff after his deployment but feels . . . Bogart has no intention of retaining him as an employee."

The IG complaint included a written statement from Pegg. Pegg wrote, "[i]n the short time [Bogart] has been here," he has "displayed several instances of unethical, toxic, and I believe illegal behavior." He said that he had not wanted to "bring[] these up" since he had "competed" against Bogart for the Commandant position and so "realize[d] how these subsequent issues might look coming from me." He stated that on July 2, another member of the Commandant's staff spoke to Pegg "about the same observed problems" but feared retaliation if he or she "spoke up or opposed" Bogart.

Pegg's written statement alleged that Bogart "[p]ublished a known-inaccurate position advertisement for my position, and made clear that it would be conventionally filled rather than as a temporary hire." He further stated that Bogart's offer of another position "equal in pay, rank and authority" was disingenuous because "[t]here is no equivalent position for what I do, not on the Commandant's Staff nor anywhere else at VMI." He asserted that the changes Bogart made to the replacement ad show that he "intends to prevent my return to my position on the Commandant's Staff" and "made it very clear" he does not "want or expect me to return to my current position." Pegg wrote that he suspected Bogart "already has someone waiting in the wings for the position and . . . intends to bring that person on full-time and permanently."

Additionally, Pegg's written statement alleged that Bogart "made clear threats of retaliation against those who might oppose him," "bragged about his connections in Washington DC and in the higher echelons of the Army, including the Army G1" and could call upon the G1 or the "boss's boss's boss" to "deal with any opposition" to him.

### III. Pegg's Return from Deployment

Pegg finished his deployment in June 2022. On June 13, he emailed VMI HR and Bogart stating that he expected to be available to return to his position "sometime mid- to late-July" and requesting a start date in that time period. Bogart notified Chief of Staff John Young, who was unfamiliar with the preexisting plan to reemploy Pegg but stated the next day that Pegg was at least entitled to an "equivalent position." Pegg and Young met virtually the following day, June 15, to discuss potential positions for him. Pegg asserted in discovery that during this meeting Young told him there was "no slot available" for him on the Commandant's staff.

On June 30, Lexington attorney Benjamin Thurman emailed Young to inform him that Thurman would be "handling [Pegg's] pending litigation with VMI." Pegg had not sued VMI at this point.

On July 6, Young emailed his staff that Pegg was returning from deployment soon but had not yet "confirmed his precise return date (we anticipate 25 July)." Young's email asked to receive from his staff "a potential employment opportunity" for Pegg "consistent with his previous responsibilities/rank" by July 18. On July 13, Bogart emailed Young stating that he was "available to place" Pegg in his former position of Deputy Commandant for Operations, Plans and Training. Bogart noted that the position's current incumbent was Commander Julie Shank, the temporary hire who had replaced Pegg and would remain on the Commandant's staff "in a different capacity." Bogart recalled that Pegg had been "upset" at the replacement ad's lack of temporary language but asserted that "there was no need to label the position temporary" because it would be subject to renewal anyway by the time Pegg returned. He stated that he had told Pegg that he could have his "old job back" upon returning from deployment. Another staff member, Kevin Faust, similarly recommended that Pegg be reinstated to his original position and Shank reassigned.

## IV. Offer of Reemployment

On July 15, 2022, Young emailed Pegg with the offer of returning to the same position of Deputy Commandant of Operations, Plans and Training, beginning July 24. Apparently receiving no reply from Pegg, Young sent a follow-up email on July 21 requesting that he "respond accordingly so that we can properly onboard you effective 24 July." Pegg's reply later that day did not accept the position but instead asked for "a response to the issues I highlighted before my deployment to the IG's office." Young replied that Pegg had not requested any formal investigation but could meet with the IG again to "chart a path forward to address your issues"; but in the meantime, Young needed Pegg's response to the offer of reemployment.

On July 23, Pegg replied to Young that his "reason for speaking with the IG's office" had been to "prompt an investigation" and "prevent further problems." Since "that didn't happen,"

Pegg refused to commit to returning to work on July 25. On July 25, the day Pegg had been expected to return to work, Young again followed up and asked "when/if" Pegg plans to return to VMI. Pegg did not reply.

In October 2022, VMI HR emailed Pegg to tell him that he must submit the required application for reemployment to VMI no later than October, which would be 90 days after completion of his service. VMI HR stated that it had made "numerous attempts to reach out to you regarding your intentions" but that "you have not indicated whether you intend to continue your employment at VMI." VMI HR also wrote, "[N]ot only were you informed that you could return to your previously held position as Assistant Commandant, [but] several other options for reemployment were also discussed with you."

In December 2022, VMI HR again informed Pegg that he must submit an application for reemployment but that his 90-day window had passed. Consequently, "[i]n the absence of any further contact from you," VMI would "assume you do not intend to return to VMI" and would "close out your employment."[1]

## V. Proceedings

Pegg sued VMI in January 2023 in the Rockbridge County Circuit Court. On March 14, VMI filed a plea in bar and a demurrer. The court notified the parties that it would hold a hearing on VMI's motions on August 10.

---

[1] Pegg's pleadings refer to the fact that he was offered two demotions prior to the July 15 offer. But his citations to the record do not prove this. First, he cites his July 21 email to Young in which he asked to be updated on the issues he raised in his pre-deployment IG complaint before he would consider returning to work. Second, he cites his attorney's July 28 request to VMI to preserve potential claims and evidence. Third, he cites VMI HR's October follow-up email stating that Pegg had been "informed that you could return to your previously held position as Assistant [sic] Commandant." But all three communications occurred *after* VMI's offer of reemployment. Additionally, the VMI HR email states that Pegg had been offered the chance to return to his "previously held position," meaning that "Assistant Commandant" was likely a typo. His evidence does not support the contention that VMI ever offered him a demotion, let alone before its July 15 offer of the same position he held before deploying.

On July 12, the court issued a pretrial scheduling order setting a deadline for dispositive motions and requiring responses to dispositive motions to be filed "no later than 14 days prior to hearing." This created a deadline of July 27 for Pegg to respond to VMI's motions.

Pegg filed his response to VMI's plea in bar and his response to VMI's demurrer, which included a request to amend his complaint. Both responses were filed on August 2, six days late. But in a later consent motion VMI "agreed with [Pegg's] counsel to not object to [Pegg's] untimely filing of [his] [r]esponse[s]."

Following its August 10 hearing on VMI's motions, the court granted the demurrer but gave Pegg leave to file an amended complaint. Pegg's amended complaint alleged discrimination and retaliation in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"). Count I alleged VMI discriminated against him in violation of 38 U.S.C. § 4311 for "failing [to] re-hire him" and "failing to prevent a hostile work environment of which [VMI] had ample notice." Count II alleged VMI retaliated against him "for [his] service commitments" and "failed to properly contribute to [his] retirement account . . . on multiple occasions due to his military service."

On March 14, 2024, VMI filed a motion for summary judgment. The court notified the parties that it would hold a hearing on VMI's summary judgment motion on April 26. Under the court's pretrial scheduling order, Pegg's deadline to make his response was April 12. But Pegg filed his memo in opposition to VMI's summary judgment motion on April 18. Thus, his SJM response was six days late under the pretrial scheduling order, and VMI moved to strike it from the record. The court denied VMI's motion to strike.[2]

_____

[2] VMI assigns cross-error to the trial court's denial of its motion to strike Pegg's memo in opposition to summary judgment, filed six days late under the pretrial order. We decline to address this issue because we find that Pegg's appeal fails even without viewing his memo in opposition to summary judgment. The cross-error is, accordingly, moot.

In its final order, the trial court granted VMI's summary judgment motion. The court determined that there was "no genuine issue of material fact in this case." It noted that Pegg had received a proper offer of reemployment that complied with USERRA but had refused the offer. Pegg did not allege that the offer failed to provide him with the same position he was in when he left or a position of like seniority, status, and pay, but only that the offer was not prompt and was invalid. The court declined to address Pegg's "conclusory assertions" of Bogart's "state of mind or motivation" but held that his argument that VMI failed to comply with its own policies in employing Shank was immaterial to his claims. Continuing, the trial court stated that USERRA "provides protection to the servicemember, not to a person who filled his position while he was on deployment." Likewise, the "manner in which VMI advertised and filled [Pegg's] position" was also not "material to [his] claims against VMI or to the reemployment rights provided by USERRA."

Having returned from deployment, the trial court found that VMI "afforded [Pegg] the reemployment rights provided by USERRA" when it offered to place him in the same position he had held before deploying. Moreover, the court found that "no reasonable finder of fact could conclude that the July 15 offer was untimely under the circumstances." As such, there was no issue of material fact to defeat VMI's summary judgment motion, which the court granted.

ANALYSIS

Pegg argues both that the promptness and the validity of the offer of reemployment presented genuine issues of material fact for which summary judgment was improperly granted. "Under well-settled principles, we review the record applying the same standard a trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009) (citing

*Dickerson v. Fatehi*, 253 Va. 324, 327 (1997); *Carson v. LeBlanc*, 245 Va. 135, 139-40 (1993)). "In this context, we have repeatedly held that summary judgment is a drastic remedy, available only when there are no material facts genuinely in dispute." *Id.* (citations omitted). "Thus, if the evidence is conflicting on a material point or if reasonable persons may draw different conclusions from the evidence, summary judgment is not appropriate." *Id.* (citing *Jenkins v. Pyles*, 269 Va. 383, 388 (2005)).

Pegg's amended complaint alleges discrimination and retaliation in violation of USERRA. "USERRA prohibits discrimination against uniformed service members." *Bumpus v. United States Airlines, Inc.*, 2024 U.S. Dist. LEXIS 173408, at *9 (N.D. Ill. 2024) (citing 38 U.S.C. § 4311).[3] "In relevant part, USERRA provides, 'A person who is a member of . . . a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership.'" *Id.* (alteration in original) (quoting 38 U.S.C. § 4311(a)). "Under Section 4311, military service must be a 'motivating factor' in the discriminatory act." *Id.* (citing 38 U.S.C. § 4311(c)(1); *Staub v. Proctor Hosp.*, 562 U.S. 411, 417 (2011)).

Section 4311 also has an anti-retaliation provision. *See Kitlinski v. MSPB*, 857 F.3d 1374, 1381 (Fed. Cir. 2017). "USERRA's prohibition against retaliation in [S]ection 4311(b) provides that an employer 'may not discriminate in employment against or take any adverse employment action against any person' because he has taken an action to enforce a protection provided by USERRA or has exercised a right provided for by USERRA." *Id.* (quoting 38 U.S.C. § 4311(b)). "To make a prima facie showing of retaliation, the plaintiff must show that []he engaged in protected conduct, that []he suffered an adverse employment action, and that a

---

[3] Although not binding on this Court, case law from federal district and circuit courts, particularly when addressing the application of federal statute or regulation, can be instructive and persuasive authority.

causal nexus exists between the protected activity and the adverse action." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014) (citing *Gerald v. Univ. of P.R.*, 707 F.3d 7, 24 (1st Cir. 2013)).

## I. Promptness of the Offer of Reemployment

Pegg argues that there is a "jury question as to the promptness of [his] reemployment." He asserts that the offer of reemployment took 32 days, which was not prompt because it should have been made within two weeks. Pegg further argues that his "position having been filled with a replacement [i.e., Shank] is not a sufficient reason to deny prompt employment." He also alleges that VMI could have offered him a position of like seniority, status, and pay but instead "twice demanded" that he "accept a demotion" to Assistant Commandant, rather than Deputy Commandant, *see supra* note 1, only offering Pegg his original position when threatened with litigation.[4]

VMI responds that Pegg's refusal to accept VMI's offer shows that he never "sought to be reemployed pursuant to USERRA." Additionally, VMI argues that it did seek to promptly reemploy Pegg because the offer was within his requested starting period and was made as soon as practicable under the circumstances. We agree.

"USERRA provides that a person who is a member of a uniformed service shall not be denied reemployment on the basis of h[is] membership in that uniformed service." *Mace v. Willis*, 259 F. Supp. 3d 1007, 1014 (D.S.D. 2017). "Under the statutory [USERRA] scheme, §§ 4312 and 4313 are interconnected, operating in a complementary manner." *Harwood v. Am. Airlines, Inc.*, 963 F.3d 408, 416 (4th Cir. 2020). "[Section] 4313 operates to define the rights of

---

[4] At oral argument, Pegg was clear in his assertion that the lack of promptness was but one factor that the trier of fact should consider in determining whether his offer of reemployment complied with USERRA. The lack of promptness, he admitted, was not a separate actionable claim.

returning servicemembers 'entitled to reemployment under [§] 4312.'" *Id.* (citing *Butts v. Prince William Cnty. Sch. Bd.*, 844 F.3d 424, 430 (4th Cir. 2016)). Where there is "no dispute as to whether [a returning veteran] fulfilled the prerequisites of [§] 4312," the veteran is "entitled to prompt reemployment pursuant to [§] 4313." *Huff v. Winston*, 292 Va. 426, 441 (2016); *see also* 38 U.S.C. § 4313(a).

A federal regulation defines "prompt employment":

> "Prompt reemployment" means as soon as practicable under the circumstances of each case. Absent unusual circumstances, reemployment must occur within two weeks of the employee's application for reemployment. For example, prompt reinstatement after a weekend National Guard duty generally means the next regularly scheduled working day. On the other hand, prompt reinstatement following several years of active duty may require more time, because the employer may have to reassign or give notice to another employee who occupied the returning employee's position.

20 C.F.R. § 1002.181.

Prompt employment means "as soon as practicable under the circumstances of each case," but, absent unusual circumstances, "*must* occur within two weeks of the employee's application for reemployment." *Serricchio v. Wachovia Sec. LLC*, 658 F.3d 169, 180 (2nd Cir. 2011) (quoting 20 C.F.R. § 1002.181). "Unfortunately, 'there is a dearth of case law' on what constitutes 'prompt reemployment.'" *Davis v. Crothall Servs. Group, Inc.*, 961 F. Supp. 2d 716, 733 (W.D. Pa. 2013) (quoting *Vander Wal v. Sykes Enters., Inc.*, 377 F. Supp. 2d 738, 746 (D.N.D. 2005)). Federal courts tend to strictly read the regulatory two-week rule. *See, e.g.*, *Petty v. Metro. Gov't of Nashville-Davidson Co.*, 538 F.3d 431, 436, 444 (6th Cir. 2008) (finding three weeks between the application and reemployment not prompt); *Mace*, 259 F. Supp. 3d at 1018 (again finding three weeks not prompt); *Jimenez v. Holbrook Plastic Pipe Supply, Inc.*, 761 F. Supp. 3d 500, 510 (E.D.N.Y. 2024) ("[T]he 'promptness' requirement[] . . . has been interpreted to require reemployment action within 14 days."). But a veteran's return to work "on

the first day he indicated he was available to work constitutes 'prompt reemployment' under USERRA" as a matter of law. *Vander Wal*, 377 F. Supp. 2d at 747.

The trial court's conclusion that VMI's offer of reemployment was prompt as a matter of law is correct because Pegg received the offer in the timeframe in which he specified that he was available to start work. Pegg notified VMI via email on June 13 that he was "available to return to my position sometime mid- to late-July." His notice email requested that VMI "give me a start date in that period." The offer of reemployment conformed to Pegg's request, being made on July 15 and offering an onboarding date of July 24. Moreover, the offered position was the same one that Pegg had held prior to deploying.

Where "a reasonable jury f[i]nd[s] that the offered position[] did comply with the USERRA requirements, [the employer] would no longer have an obligation to [the veteran]." *Davis*, 961 F. Supp. 2d at 733. Here, Pegg does not point to any facts that could justify a jury finding that VMI did not comply with the USERRA requirements. VMI's offer was both prompt and proper (i.e., for the same position). Since a reasonable jury would have no choice but to find that VMI's offer complied with USERRA, VMI's obligation to Pegg ended with its July 15 offer. In view of this, the trial judge did not err in granting summary judgment.

## II. Validity of the Offer of Reemployment

Pegg's three remaining assignments of error challenge the validity of the offer of reemployment. Assignment of error 2 alleges that the trial court incorrectly found that VMI's failure to comply with its own policies in employing Shank to temporarily fill Pegg's position was immaterial to his claims. Pegg asserts that VMI "adopted an employment policy" that "clearly mandates the satisfaction of certain conditions precedent to reassigning an employee"; namely, to provide that employee with notice three months in advance of reassigning her. By

- 13 -

failing to timely notify Shank before reassigning her, as well as extending her contract for another year, Pegg "challenges whether his position was available at all."

Assignment of error 3 argues that VMI's replacement ad was "a barrier to [Pegg's] prompt reemployment into his original position upon his return." By advertising for a conventional rather than temporary position, the replacement ad "ultimately affected whether he was reemployed promptly in accordance with USERRA." Pegg asserts that a "jury could have determined that [VMI] structured the advertisement and filling of [his] position in the manner that it did to ensure that [Pegg] would not have a slot available when he returned."

Assignment of error 4 asserts that the trial court erroneously made a credibility determination when it "overlooked evidence that a reasonable jury could find that [VMI]'s offer of reemployment was not valid." He states that he had "a good faith reason to believe that the position offered to him on July 15" was not a valid offer and was motivated by discriminatory animus. In particular, he argues that VMI offered him "two positions that were tantamount to demotions," which showed animus, *but see supra* note 1; that Pegg gave direct and circumstantial proof of Bogart's discrimination; that the offered position "was being occupied by a conventional employee," Shank, whose contract had been extended for another year (restating Assignments of error 2 and 3); and that the court improperly assessed the credibility of Young's July 15 offer email despite Young being "a subordinate of . . . Bogart, the same individual that [Pegg] had previously accused of military animus." Pegg concludes that these points, which cast doubt on whether "this job offer was valid[,] goes to the heart of whether [Pegg] was offered prompt reemployment."

We find no merit in these contentions. First, Pegg uses these errors to guess at why VMI's offer may have come outside the regulatory two-week deadline. But as we found above, the offer of reemployment was prompt because it came within his requested starting period. Second, these

errors lack merit because they speculate as to harm that Pegg never actually suffered. Having declined VMI's valid offer, he assumes that Shank's allegedly permanent status and VMI's manner of advertising for his replacement show discriminatory animus behind the July 15 offer. Yet these circumstances only bear on the timing of VMI's offer; Pegg does not point to any requirements of USERRA outside of promptness that these circumstances may have implicated or violated. By declining the offer, Pegg never suffered any adverse employment action on the part of VMI. VMI's offer complied with USERRA, and Pegg cannot create a claim under USERRA by refusing the offer merely because he feared retaliation or subjectively believed that the offer was invalid due to Bogart's involvement in it. Pegg may have worried about retaliation if he accepted the position, but by failing to accept it, the harm he alleges is speculative and anticipatory only.

And like the trial court, we decline to address the conclusory allegations of VMI or Bogart's state of mind contained in Assignment of error 4. We simply do not find support in the record to substantiate Pegg's claim that Bogart undermined his offer behind the scenes. Pegg guesses that this is so, given Bogart's alleged behavior prior to his deployment. But Pegg makes no factual allegation that, after his return from deployment, Bogart acted to undermine what is clearly a valid offer. In fact, the email evidence shows Bogart recommending that Shank be reassigned and Pegg be placed back into his former position of Deputy Commandant.

CONCLUSION

VMI discharged its obligation under USERRA by giving Pegg an unconditional offer of reemployment to the same position. *See Davis*, 961 F. Supp. 2d at 733. The offer was made during the timeframe that Pegg requested. Such an offer complied with USERRA and was prompt, ending VMI's obligation to Pegg. Thus, we affirm the dismissal of his claims on summary judgment.

*Affirmed*.