# United States Court of Appeals
## For the First Circuit

No. 15-2003

XIAOYAN TANG,

Plaintiff, Appellant,

v.

CITIZENS BANK, N.A., a/k/a Citizens, N.A., a/k/a Citizens,
a/k/a RBS Citizens, N.A.; RBS CITIZENS, N.A.;
ROYAL BANK OF SCOTLAND GROUP, a/k/a RBS; DAVID NACKLEY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Julie E. Green, with whom Todd & Weld LLP, was on brief for appellant.
Mark W. Batten, with whom Rebecca J. Sivitz and Proskauer Rose LLP, were on brief for appellees.

May 19, 2016

**TORRUELLA**, **Circuit Judge**. Xiaoyan "Ivy" Tang was terminated from her position in the Technology Banking Group at Citizens Bank, N.A. ("Citizens") in June 2011. She sued Citizens and her supervisor, David Nackley, then the Senior Vice President of the Technology Banking Group, bringing numerous claims stemming from her termination. Relevant here are her claims for retaliation and sexual harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and Massachusetts General Laws Chapter 151B ("Chapter 151B"). The United States District Court for the District of Massachusetts entered summary judgment in favor of Citizens and Nackley, and Tang now appeals that decision. We vacate and remand.

**I.**

**A.  Factual Background**

"We recite the facts in the light most favorable to [Tang] as the non-moving party." Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 20 (1st Cir. 2011).

Tang began working in the Commercial Real Estate Group of Citizens in October 2007 in Boston. After applying for a position as a portfolio manager in the Technology Banking Group, Tang interviewed with Nackley in early 2010.[1] Nackley had arranged

---

[1]  The parties dispute Tang's reason for transferring from the Commercial Real Estate Group. Whereas Tang asserts that she was interested in the professional opportunities available in the

-2-

the interview at a restaurant that Tang characterized as a popular dating spot. During the interview, Tang was surprised by Nackley's focus on personal matters and other topics not relevant to the transfer. Tang, who is Chinese, recalled that Nackley expressed his views that Asian women are obedient and mentioned two live-in au pairs whom he had hired from Thailand. He told Tang that the Thai au pairs did not wear sufficiently revealing swimsuits and also offered to teach Tang to golf. Nackley asked whether Tang was married and, after she said no, enquired where she looked to find a boyfriend. In response, Tang told Nackley that this was her business. She does not recall how he responded to this comment.[2]

At the end of the interview, Tang showed Nackley examples of her work from the Commercial Real Estate Group. Nackley described this work as "excellent" and encouraged her to apply for a position as a senior portfolio manager. Although Tang felt uncomfortable during the interview, she did not believe she would

---

Technology Banking Group, Citizens suggests that Tang was hoping to start anew after receiving a mediocre performance review in the Commercial Real Estate Group.

[2] Nackley disputes that he focused on only personal matters during the interview. In a declaration, he asserts that "[m]y questions for Ms. Tang focused primarily on why she wanted to leave the Commercial Real Estate Group," and describes the conversation as "entirely professional." That said, he does not deny making any of the comments alleged by Tang.

be working directly with Nackley and was extremely excited for the opportunity to work in technology and capital markets, her longtime career goals. At that time, she did not share her concerns about Nackley's conduct with anyone. Tang pursued the transfer and interviewed with other members of the Technology Banking Group.

Tang began working as a portfolio manager in the Technology Banking Group in May 2010. Nackley typically worked from his home office in Connecticut and visited the Boston office on a weekly basis. In July 2010, he met with Tang for a semi-annual performance review at the office. According to Tang, however, Nackley did not discuss Tang's work during the meeting. Nackley brought up his two Thai au pairs, telling Tang what they wore at his swimming pool and asking what type of swimsuit she preferred. He again stated that he wished his au pairs wore more revealing swimsuits and reiterated that he thought Asian women were obedient. He also discussed the immigration status of the Thai au pairs. Tang is not a United States citizen, and Nackley indicated that "he had great control over" her immigration status and future career at Citizens. Nackley again asked Tang where she found men and queried which dating websites she used.

During this meeting, Nackley wrote the word "assume" on a piece of paper and stated it could be broken into "ass," "u," and "me." He then stood up, gestured to Tang's "private area,"

-4-

and said, "This is your ass, this is my ass." Nackley drew closer to Tang and became very excited.[3] He suggested that Tang "combine [her] 'ass' with [his] 'ass' and "ma[de] obscene coupling indications with his hands."

Following this conversation, Tang felt deeply uncomfortable in Nackley's presence and avoided interacting with him. Although Nackley never directly propositioned Tang, he "made it very clear" he wanted a relationship with her: on various occasions when Nackley encountered Tang in the office, he would broach the topic of his Thai au pairs and their swimming attire. He would offer to teach her to golf, leer at her, and repeat that he thought Asian women were obedient.

Tang asserts that Nackley's attitude toward her changed dramatically once he realized she was not responding to his advances. In January 2011, Tang was surprised to receive a negative performance review from Nackley. The review indicated that "development [was] required" in various areas, that Tang "need[ed] to focus on being able to work [i]ndependently and complete the required tasks . . . without assistance/ intervention," and that "[h]er level of performance in terms of

_____

[3] Tang does not recall if Nackley walked toward her or leaned toward her. In any case, she stated that he was "very close to [her] physically."

-5-

deal completion times is well below that of her peers." Concerned that she would lose her job if she refused to endorse the evaluation, Tang signed the review, stating that she "appreciate[d] the constructive advice . . . and look[ed] forward to utilizing it in the coming year."

Tang had two additional meetings with Nackley in February 2011. In the first meeting, which took place in early February, Nackley gave Tang a Performance Improvement Plan ("PIP").[4] The PIP reiterated many of the concerns raised in Tang's January review and established steps that Tang needed to achieve "to improve [her] performance deficiencies." Tang asserts that Nackley became angry and shouted at her during this meeting, telling her to "shut [her] mouth," and stating that she did "not have any rights."[5]

In the second February meeting, Nackley again became angry with Tang. In his declaration, Nackley asserts that he had

---

[4] The parties do not agree as to the dates of these meetings. Nackley asserts that the meeting in which Nackley gave Tang the PIP took place on February 8, 2011, whereas Tang asserts that the second meeting took place on February 8.

[5] Many of the details as to the February meetings were not presented to the district court prior to its ruling on summary judgment and only asserted later, in Tang's motion for reconsideration. Nevertheless, we recite them here insofar as they clarify Tang's account of the events leading up to her dismissal from Citizens.

recently learned that Tang was dating Mark Atkin, an executive at a company that was a client of the bank, and the meeting "was solely for the purpose of preventing or eliminating any conflict of interest and protecting the integrity of the bank's business." To the contrary, Tang asserts that Nackley had known about Atkin since February 2010 and that neither Citizens nor Nackley had ever required that she disclose her relationship with him. During the meeting, Nackley "waved his arms" as if to "beat" Tang and threatened to "kick [her] out of the bank" if she did not identify Atkin. Appalled by Nackley's behavior and aggressive questioning, Tang became emotional and "begged" Nackley to let her leave. A human resources representative joined the meeting by telephone and also pressured Tang to disclose her relationship with Atkin. Defeated, Tang told them that she had broken off the relationship. The meeting was adjourned, and, as Nackley left, he informed Tang, "You are being watched."[6] Tang later observed Nackley mimicking her emotional responses during the meeting to two of Tang's coworkers, Relationship Manager William Clossey and senior Portfolio Manager Jennifer Perry.

---

[6] In his declaration Nackley provided a very different description of the meeting: "Ms. Tang said very little and did not seem emotional. She did not raise her voice, nor did anyone else in the meeting."

On February 14, 2011, Tang returned the PIP with a handwritten note stating that she "disagree[d] with the Performance Improvement Plan" and "felt the plan [wa]s the result of discriminatory treatment based on my race, gender and national origin." That same day, Tang called the human resources hotline to report Nackley's behavior. A human resources representative, Brenda Cosgrove, called Tang requesting more information and Tang responded by letter dated February 27, 2011. In her letter, Tang detailed Nackley's comments regarding his Thai au pairs and the purported obedience of Asian women, his constant questions about Tang's relationships, and the "assume" conversation in July 2010. She also asserted that her "work has been highly professional and competent" and that the PIP was "false, outrageous, and indeed, ludicrous." Tang declined Cosgrove's suggestion that the two set up a time to speak, instead requesting that all their communications be in writing. Cosgrove informed Tang that she would be "unable to conduct a proper investigation if I am not able to speak with you," and that, if Tang continued to refuse, Cosgrove would "have to proceed with [the] investigation without the benefit of [Tang's] input." Tang still refused, and Cosgrove did not send Tang any further questions. On March 31, 2011, Cosgrove issued an investigative summary finding that Tang's "allegations were unsubstantiated."

Unhappy with Cosgrove's treatment of her complaint, Tang conducted her own investigation and spoke to a former colleague who described Nackley as "notorious for disrespect[ing] women."[7] In May 2011, Tang reported these findings to human resources, but Citizens did not pursue her claims.

On May 25, 2011, Tang received a Final Written Warning ("FWW") from Nackley stating that Tang "failed to demonstrate improvement" since receiving her PIP. In mid-June, Nackley learned that Tang "had made a material mistake in violation of her FWW." She was terminated later that month.

## B. Procedural History

Proceeding pro se, Tang brought this action against Citizens and Nackley on March 7, 2014.[8] Her amended complaint included separate claims for fraud, promissory estoppel, sexual harassment, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, unfair and deceptive acts under Massachusetts General Laws Chapter 93A, termination in violation of public policy, discrimination under

---

[7] Again, Tang first described the facts surrounding this independent investigation and her subsequent complaint in her motion for reconsideration before the district court.

[8] Tang originally filed suit in Massachusetts state court. After she submitted an amended complaint, the case was removed to federal court on June 17, 2014.

Title VII and Chapter 151B, intentional infliction of emotional distress, and negligent failure to supervise.  Tang's amended complaint also included an allegation that the "[d]efendants did wrongfully, unlawfully, unjustly, and tortiously fire her, as a result of her respectfully informing HR of her complaint against him, and her declining to have sex with him."

The defendants filed a motion for partial judgment on the pleadings in July 2014.  They sought to dismiss all her claims except the counts for discrimination under Chapter 151B and Title VII, arguing, among other things, that Tang's common law and Chapter 93A claims should be dismissed, as Chapter 151B provides the exclusive remedy for employment discrimination disputes under Massachusetts law.  The district court allowed the motion without comment in an electronic order.  Tang sought to amend her complaint and add several claims, including counts for retaliation and retaliation in violation of public policy, in April 2015.  The district court denied the motion as untimely.

The defendants sought summary judgment as to Tang's remaining claims.  At the motion hearing, the district court granted the defendants' motion from the bench.  The district court noted that, even if Nackley had acted inappropriately, Tang's allegations did not amount to sexual harassment:

> [S]o we take it [Nackley] says, 'This is your ass,
> this is my ass,' and then he physically approaches

you.  Now that's probably a rather boorish choice of words, but I don't really see the sexual harassment there. . . . [T]he same terms could be used between people of the same gender, and it's that type of problem that I'm having with your whole case.

The district court noted that nothing in the record indicated that Nackley had ever touched Tang or made sexual demands of her. Accordingly, the district court determined that Tang's version of events did "not constitute a triable issue of sexual harassment." The district court did not address the issue of retaliation.

Tang filed two motions for reconsideration, both of which were denied.  In the second motion, she asserted additional evidence and reiterated that her case also involved a claim for retaliation.  The district court denied the motion in a two-line electronic order, explaining that "[w]hatever new material is provided in support of this motion is both untimely and unverified."  Now represented by counsel, Tang appeals on the basis that the district court erred in dismissing her retaliation and sexual harassment claims.

## II.

### A.  Standard of Review

The grant of summary judgment is subject to de novo review, with all reasonable inferences drawn in favor of Tang as the non-moving party.  Pérez-Cordero, 656 F.3d at 25.  The non-moving party, however, must "produc[e] specific facts

-11-

sufficient to deflect the swing of the summary judgment scythe." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003). Summary judgment is warranted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if it can 'be resolved in favor of either party,' and a fact is 'material' if it 'has the potential of affecting the outcome of the case.'" Pérez-Cordero, 656 F.3d at 25 (quoting Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004)).

## B. Hostile Work Environment

Title VII prohibits "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[9] There are two primary types of sex-based discrimination claims. In the case of "quid pro quo sexual harassment[,] . . . an employee or supervisor uses his or her superior position to extract sexual favors from a subordinate employee, and if denied those favors, retaliates by taking action adversely affecting the

---

[9] Chapter 151B is Massachusetts's analog to Title VII's discrimination and retaliation bar. See Billings v. Town of Grafton, 515 F.3d 39, 47 n.6 (1st Cir. 2008). As neither party has identified meaningful distinctions between Title VII and Chapter 151B that would affect the outcome here, we do not provide separate analysis for the Chapter 151B claims. See id.

subordinate's employment."  O'Rourke v. City of Providence, 235
F.3d 713, 728 (1st Cir. 2001).  Quid pro quo sexual harassment "is
actionable because it involves explicit and tangible alterations
in the terms or conditions of employment."  Pérez-Cordero, 656
F.3d at 26.

Title VII's discrimination ban also "extends to sex-
based discrimination that creates a hostile or abusive work
environment," also known as sexual harassment.  Billings v. Town
of Grafton, 515 F.3d 39, 47 (1st Cir. 2008).  To prevail on a
claim for sexual harassment, a plaintiff must make a six-part
showing:

> (1) that she (or he) is a member of a protected
> class; (2) that she was subjected to unwelcome sexual
> harassment; (3) that the harassment was based upon
> sex; (4) that the harassment was sufficiently severe
> or pervasive so as to alter the conditions of
> plaintiff's employment and create an abusive work
> environment; (5) that sexually objectionable conduct
> was objectively and subjectively offensive, such
> that a reasonable person would find it hostile or
> abusive and the victim in fact did perceive it to be
> so; and (6) that some basis for employer liability
> has been established.

O'Rourke, 235 F.3d at 728.  Because the defendants focus on whether
Tang was subjected to sex-based discrimination under the second
and third prongs and whether the alleged harassment was severe or
pervasive and both objectively and subjectively offensive under
the fourth and fifth prongs, we focus on these elements as well.

-13-

## 1. Sex-Based Discrimination

The defendants assert that Tang cannot show that the alleged harassment was based on sex, as she asserts no evidence of sexual comments or behavior.[10] As the district court determined, Tang does not allege that Nackley directly propositioned her or touched her. Title VII, however, does not require evidence of overtly sexual conduct for a sexual harassment claim. See O'Rourke, 235 F.3d at 729; see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) ("Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity . . . .").

The defendants assert that, even accepting Tang's testimony as true, many of Nackley's comments lack any sexual content. For example, the defendants contend that Nackley's use of the word "ass" is not sexual in nature because "[t]he term 'ass' is a vulgar expression that refers to a portion of the anatomy of both sexes." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1543 (10th Cir. 1995). Similarly, as to Nackley's remarks regarding his Thai au pairs, the defendants note that Tang does not allege

---

[10] The defendants do not dispute that Tang considered Nackley's conduct unwelcome.

-14-

that he ever made blatantly sexual comments about them.  But Title VII requires no magic words to convert a verbal exchange into the stuff of sexual harassment.  See Billings, 515 F.3d at 48 ("[N]o particular 'types of behavior' are essential to a hostile work environment claim.").  The context in which something is said may be just as important as what is said.  Cf. O'Rourke, 235 F.3d at 730 ("Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct.").  As the defendants argue, an innocuous comment that Nackley hired two Thai au pairs, without more, is unlikely to qualify as sexual harassment.  When viewed in the context of Tang's allegations that Nackley also discussed the purported obedience of Asian women and whether the au pairs' swimwear choices were sufficiently revealing, however, Nackley's statements take on a sexually suggestive tone.

Similarly, using the word "ass" in the workplace does not necessarily amount to sexual harassment:  like many words, "ass" has varied meanings and connotations that hinge on the context in which it arises.  Here, Tang alleges that Nackley approached her, gestured at her "private area," and made obscene gestures with his hands.  The defendants assert that Tang's testimony as to this episode (and many others) has grown more

elaborate with time and urge us to disregard her changed testimony. A party's inconsistent testimony may render her an easily impeachable witness: it does not mean that summary judgment is warranted. See Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 49 (1st Cir. 1999) ("[C]redibility determinations are for the factfinder at trial, not for the court at summary judgment.").[11]

The defendants contend, and Tang agrees, that many of the exchanges alleged here do not involve sexual conduct. For example, even if the court accepts Tang's allegations that Nackley yelled at her during the February meetings, this aggressive behavior is not necessarily based on her sex. However, "[t]he fact that not all of the complained-of conduct has obvious sexual

---

[11] The defendants are correct that, "[w]here a party has given 'clear answers to unambiguous questions' in discovery, that party cannot 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory.'" Escribano-Reyes v. Prof'l Hepa Certificate Corp., Nos. 15-1259, 15-1404, 2016 WL 1239570, at *3 (1st Cir. Mar. 30, 2016) (quoting Hernández-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000)). Contrary to the defendants' assertions, Tang's deposition testimony is largely consistent with the account in her later-filed affidavit, although her affidavit does expand on some of her deposition testimony. Nevertheless, both the deposition testimony and the affidavit contain many of her core allegations as to her sexual harassment claim, including that Nackley approached her and made obscene gestures in the "assume" conversation and that he commented on the Thai au pairs' swimwear. Although her initial complaint to human resources omitted many of these more objectionable details, the defendants do not cite any authority suggesting that Tang is bound by the accusations raised in a human resources complaint.

connotations does not diminish the force of the evidence indicating gender-based animus."  Pérez-Cordero, 656 F.3d at 28.  Further, Tang alleges that Nackley's egregious behavior in their later interactions stemmed from her having rebuffed his advances, and "when harassment is motivated by a failed attempt to establish a romantic relationship, 'the victim's sex is inextricably linked to the harasser's decision to harass.'"  Id. (quoting Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 229 (1st Cir. 2007)).

Viewing the circumstances as a whole, then, this court determines that the evidence was sufficient to raise a reasonable inference that Nackley engaged in sex-based discrimination.

### 2. Severe or Pervasive; Objectively and Subjectively Offensive

For purposes of a sexual harassment claim, the conduct must be so severe or pervasive that it "amount[s] to a change in the terms and conditions of employment."  Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014) (quoting Faragher v. City of Boca Ratón, 524 U.S. 775, 788 (1998)); see also Billings, 515 F.3d at 47.  In addition, the "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  Billings, 515 F.3d at 47 (quoting Faragher, 524 U.S. at 787).  In assessing whether conduct is severe or pervasive and both objectively and subjectively

-17-

offensive, we evaluate "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." Ponte, 741 F.3d at 320 (quoting Gerald v. Univ. of P.R., 707 F.3d 7, 18 (1st Cir. 2013)).

The defendants assert that Tang identifies only four instances of harassment -- the initial interview, the July 2010 performance review, Nackley's veiled threats as to her immigration status, and the conflict-of-interest meeting -- and such isolated incidents do not qualify as severe or pervasive. To the contrary, Tang stated that Nackley made inappropriate comments to her "[e]very time he had a chance." To be sure, Nackley did not work in the same office as Tang, and Tang's deposition testimony is unclear as to how frequently these exchanges took place. Nevertheless, Nackley frequented Citizens's Boston office and acted as the manager of the Technology Banking Group, giving Tang projects and delivering her performance reviews. On summary judgment, "we cannot definitively say . . . that [Nackley's] conduct was not sufficiently severe or pervasive to allow a jury to find in favor of [Tang] on her hostile environment claim." Billings, 515 F.3d at 50 (noting that the testimony as to the frequency of the allegedly harassing conduct was "incomplete" yet

the plaintiff testified "that it happened a lot" (alteration omitted) (internal quotation marks omitted)).

Turning to the question of whether Nackley's conduct was objectively offensive, the defendants assert that Tang's reactions to Nackley's comments were extraordinarily subjective and her description of Nackley's behavior overly vague. For example, when Nackley asked Tang about her relationship with Atkin, she reported "feel[ing] like, 'Oh, my God, this is the end of the world.'" In addition, her amended complaint alleged that Nackley told Tang "that, despite having a wife and children, he also had two Thai house girls at his home, which was also intended to suggest to Plaintiff . . . [to] get with his mandated, in effect, program of sex." In this way, the defendants ask us to interpret Tang's allegations as completely subjective responses to Nackley's otherwise innocuous comments and questions. We do not take the bait.

Tang's deposition testimony expands upon many of these exchanges. For example, Tang asserts that Nackley had learned of her relationship with Atkin long before the February meeting and his "conflict of interest" motive was purely pretextual. According to Tang, Nackley was angry that Tang had not responded to his advances and was seeking an excuse to learn about her personal life. Nackley acted outraged and was physically

threatening during the meeting and, in the months prior, had pried into Tang's personal relationships and made references to her immigration status. This cumulative evidence could support a reasonable inference that Nackley called this meeting with an improper motive.

As with many of the events described by the parties, Nackley and Tang have wildly divergent accounts of what happened at the February meeting. There is no question, however, that we must resolve all factual disputes in favor of the non-moving party on summary judgment. See id. Further, Tang has alleged that Nackley continually stared at her, asked about her personal relationships, and discussed his "Thai girls" and their swimwear choices, as well as physically approaching her and making obscene gestures during a one-on-one meeting. Accordingly, a reasonable jury could determine that Nackley's conduct, as alleged by Tang, was both subjectively and objectively offensive.

For these reasons, we find that the evidence is sufficient to defeat summary judgment as to Tang's hostile work environment claim. All in all, many of the defendants' arguments are oblique criticisms of Tang's credibility and veracity. Ultimately, these points are for the jury -- and not for the court -- to decide.

## C. Retaliation

Both Chapter 151B and Title VII prohibit employers from "retaliat[ing] against persons who complain about unlawfully discriminatory employment practices."  Noviello v. City of Bos., 398 F.3d 76, 88 (1st Cir. 2005) (citing 42 U.S.C. § 2000e-3(a); Mass. Gen. Laws ch. 151B, § 4(4)).  To demonstrate retaliation under either statute, "a plaintiff must show that (i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked."  Id.  "[A]n employee who carries her burden of coming forward with evidence establishing a prima facie case of retaliation creates a presumption of discrimination, shifting the burden to the employer to articulate a legitimate, non-discriminatory reason for the challenged actions."  Billings, 515 F.3d at 55.  Should the employer create a genuine issue of fact, "the presumption of discrimination drops from the case," and the plaintiff carries the burden of showing that the employer's reason for the adverse action was pretextual. Id. (quoting Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 336 (1st Cir. 2005)).

### 1. Waiver

As a threshold matter, we must determine whether the retaliation claim is properly before this court.  The defendants assert that any retaliation claim is waived:  Tang's amended

complaint contained no claim for retaliation, and the district court denied her request to amend her complaint to add a count for retaliation, a decision she does not dispute on appeal. Although the defendants are correct that Tang's amended complaint does not include a retaliation claim among its numbered causes of action, paragraph thirty-one of her amended complaint asserts that the "[d]efendants did wrongfully, unjustly, and tortiously fire her, as a result of her respectfully informing HR of her complaint against him, and her declining to have sex with him." In addition, her complaint contained allegations that Nackley sought a sexual relationship with her and that she was terminated despite "solid job performance" after "declin[ing] his advances." These allegations clearly set out a prima facie case for retaliation, and, given Tang's status as a pro se litigant, they are sufficient to state a retaliation claim. See Rodi v. S. New Eng. Sch. of Law, 389 F.3d 5, 13 (1st Cir. 2004) ("[T]he fact that the plaintiff filed the complaint pro se militates in favor of a liberal reading."); Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997) ("The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court

may intuit the correct cause of action, even if it was imperfectly pled.").

That said, neither the defendants nor the district court appear to have acknowledged Tang's retaliation claim. To be sure, the defendants were on notice of the claim: in their answer to the amended complaint, the defendants denied the allegation in paragraph thirty-one. Still, they made no mention of retaliation in their partial motion for judgment on the pleadings, nor did the district court refer to retaliation in its brief order granting the defendants' motion.[12] The defendants did not address retaliation in their motion for summary judgment, and neither the district court nor the defendants raised the topic at the motion hearing.

---

[12] The district court granted the motion in a single sentence, stating, "[t]he motion for partial judgment on the pleadings is allowed and the defendants' proposed schedule as modified is adopted." Given the absence of information on the record concerning the fate of Tang's retaliation claim, this order could be interpreted as a dismissal of Tang's allegations of retaliation. But the defendants do not argue this point, and, in any case, we are reluctant to accept that the district court dismissed a claim properly pled by a pro se plaintiff without explaining its reasons and lacking any argumentation from the moving party. We think the better approach is to interpret the district court's order as dismissing only those claims explicitly listed in the defendant's motion for judgment on the pleadings. And, because the motion omitted any reference to Tang's retaliation claim, that claim would have survived the pleadings stage.

At the summary judgment stage, Tang tried to notify the district court of her retaliation claim. In her opposition to the defendants' motion for summary judgment, she explained that her termination constituted retaliation for not submitting to Nackley's sexual harassment. Following the motion hearing, she submitted two motions for reconsideration, the second of which explicitly stated that "[t]his is not merely a sexual harassment cause. It is a . . . [r]etaliation . . . case." The district court denied both motions.[13] It is unclear from the record whether the district court determined that summary judgment was warranted

---

[13] Insofar as the district court denied the motions for reconsideration on the basis that Tang had failed to allege retaliation earlier in the proceedings, that decision constituted an abuse of discretion, as Tang's amended complaint contained a retaliation claim. That said, the district court did not err in declining to acknowledge evidence that Tang presented after the issuance of summary judgment. For motions for reconsideration under Federal Rule of Civil Procedure 59(e) premised on new evidence, the movant must show that "newly discovered evidence (not previously available) has come to light." Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006). The evidence alleged in her motion for reconsideration, much of which concerned events that took place around the time of her termination, was available before the district court granted the defendants' motion for summary judgment. "While courts have historically loosened the reins for pro se parties, the 'right of self-representation is not a license not to comply with relevant rules of procedural and substantive law.'" Eagle Eye Fishing Corp. v. U.S. Dep't of Commerce, 20 F.3d 503, 506 (1st Cir. 1994) (internal citations omitted) (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 140 (1st Cir. 1985)). To that end, the district court did not err in determining that Tang's submission of evidence, available long before the defendants sought summary judgment, was "untimely." For this reason, we do not consider this evidence in our analysis.

as to the retaliation claim, or, in the alternative, whether it determined that a retaliation claim had never been pled in the first place. The district court's basis for dismissing the claim is of no matter, however: because review on summary judgment is de novo, the district court's failure to address the merits of Tang's retaliation claim does not prevent us from doing so today. See Demelo v. U.S. Bank Nat'l Ass'n, 727 F.3d 117, 121 (1st Cir. 2013) (holding that, where the basis for the district court's decision is unclear, "we are not restricted to the district court's reasoning" but may decide "on any basis made manifest by the record").

**2. The Merits**

There is no question that Tang undertook protected conduct by submitting her complaint to human resources and subsequently suffered an adverse employment action upon her termination.[14] We must address whether the evidence is sufficient

---

[14] Tang also contends that she suffered retaliation because she was terminated for not responding to Nackley's advances. It is unclear to what extent such conduct qualifies as protected conduct under Title VII. See, e.g., EEOC v. New Breed Logistics, 783 F.3d 1057, 1067 (6th Cir. 2015); Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 115 n.12 (2d Cir. 2013); Tate v. Exec. Mgmt. Servs., Inc., 546 F.3d 528, 532 (7th Cir. 2008). Because neither party addresses this issue -- and because Tang's human resources complaint clearly constitutes protected conduct -- we leave for another day the question of whether Tang's act of refusing Nackley's come-ons constitutes a protected activity under Title VII. In any case, evidence that Nackley punished Tang for

to demonstrate that Tang's "protected activity was a but-for cause of the alleged adverse action by the employer." Ponte, 741 F.3d at 321 (quoting Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013)). Tang contends that the timing of her termination supports a finding of causation. She brought her complaint to human resources in February 2011 and was terminated only four months later, in June. The parties dispute whether timing alone is sufficient to demonstrate causation. Compare Ponte, 741 F.3d at 322 ("Chronological proximity does not by itself establish causality, particularly if the larger picture undercuts any claim of causation." (quoting Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (internal formatting omitted))), with Pérez-Cordero, 656 F.3d at 32 ("[T]emporal proximity between [the plaintiff]'s initial complaints and these retaliatory actions is sufficient to establish the causal connection required for a prima facie case of retaliation."). Here, however, we have more than just timing. The defendants asserted evidence of Tang's problems in the Technology Banking Group, including email chains between Tang and various supervisors that were later forwarded to Cosgrove in human resources, as evidence that Citizens had a non-discriminatory motive for terminating her. One such email

_____

rebuffing him remains relevant to her sexual harassment claim.

-26-

purports to demonstrate that Tang failed to submit a project to her supervisor before going on vacation in December 2010. Another email chain shows that, in October 2010, Tang miscalculated the risk-adjusted return on capital for a major client.[15]

To be sure, these emails show that Tang had performance issues long before she complained to human resources and that reports regarding her performance came from individuals besides Nackley,[16] evidence that militates against a finding of causation. See Ponte, 741 F.3d at 322. We nevertheless believe that the

---

[15] Tang contends that these emails are inadmissible hearsay and therefore cannot be considered on summary judgment. That argument, however, is foreclosed under Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 76-77 (1st Cir. 2005), where this court determined that a "report and physician statements were not offered to prove that [the plaintiff] engaged in misconduct, but rather to demonstrate that his superiors had reason, based on a thorough investigation, to believe that he had." Id. at 77. Similarly, these emails were not admitted to demonstrate that Tang was a poor performer, but that those in charge of hiring decisions at Citizens had reason to believe that she was. Tang asserts that there is no evidence that Nackley or anyone else in charge of these hiring decisions saw these emails. Many of these communications, however, were addressed to Nackley and Cosgrove, who, as a human resources employee, presumably would be involved in a decision to terminate an employee.

[16] Even then, many of these emails were from Perry and Clossey, two employees whom Tang has alleged were close to Nackley. Accordingly, a reasonable jury could determine that Nackley, as "[t]he target of the complaint," had "coworker-friends who c[a]me to his defense" following Tang's complaint. See Noviello, 398 F.3d at 93 (remanding on summary judgment grounds where the plaintiff's coworkers contributed to a hostile work environment following her submitting a complaint concerning another employee).

circumstances surrounding these emails are sufficient to suggest pretext, which may be shown "through 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.'" Billings, 515 F.3d at 55-56 (quoting Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998)).

Although many of the events described in these emails took place long before Tang submitted her human resources complaint, the emails appear to have been forwarded to human resources as evidence of her poor performance in March 2011, immediately after Tang's complaint that February. The most logical inference is that human resources had compiled these emails to investigate whether there was any basis for Tang's claim that her PIP was false. But, as Tang suggests, another inference is available: that, upon receiving Tang's complaint, Citizens had realized she posed a problem and was beginning to collect information for her termination. While this inference may be less plausible, it is not for this court on summary judgment to decide between competing inferences.

Tang contends that many of these emails are devoid of context, and it is therefore difficult to distinguish them from

"the ordinary back and forth involved in training a new employee."[17]

Indeed, in the instance where Tang left for vacation before finishing a project, the email recipient thanks Tang for completing her assignment while on vacation and states, "you really do not have to do this while you are on vacation." The recipient does not reprimand or otherwise criticize Tang. In addition, the defendants have declined to clarify the precise circumstances of Tang's termination. In his declaration, Nackley stated that Tang "made a material mistake in violation of her FWW," but Citizens has never explained what this "material mistake" was. Such ambiguity reinforces the impression that Citizens's reasons for terminating Tang may have been pretextual.

Tang has also presented evidence of praise she received while an employee at the Technology Banking Group and the Commercial Real Estate Group.[18] The defendants contend that Tang's

---

[17] That said, we do not accept Tang's argument that the defendants' failure to adduce evidence of performance reviews from individuals who worked more closely with Tang and reviews from before 2009 suggests that the defendants are concealing more positive evaluations for purposes of summary judgment. Indeed, had Tang felt that more positive reviews were available that Citizens had yet to tender, she had access to discovery tools and procedures under Federal Rule of Civil Procedure 56 that would have allowed her to obtain them. See, e.g., Fed. R. Civ. P. 56(d) (providing certain relief where "a nonmovant shows by affidavit or declaration that . . . it cannot present facts essential to justify its opposition").

[18] The defendants emphasize that Tang's performance review from the Commercial Real Estate Group included a score of "development

work in Commercial Real Estate is not relevant to her performance in the Technology Banking Group. Still, the fact that Tang received positive reviews up until she began working with her alleged harasser raises the reasonable inference that her negative reviews and termination were related to Nackley's behavior. To be sure, the praise is not gushing, and the fact that an employee may occasionally receive a good review does not necessarily discount a consistent record of poor performance. For this reason, we do not foreclose that a jury could reasonably find that Tang was fired as a result of her poor work product. But, "where a plaintiff in a discrimination case makes out a prima facie case and the issue becomes whether the employer's stated nondiscriminatory reason is a pretext for discrimination, courts must be 'particularly cautious' about granting the employer's motion for summary judgment." Billings, 515 F.3d at 56 (quoting Hodgens, 144 F.3d at 167).

---

required" (level two) for one of the performance categories. Based on this evidence, they ask that this court infer that she received middling reviews in Commercial Real Estate. Viewing the record in the light most favorable to Tang, we decline to interpret the performance review as such: the rest of the review indicates that Tang "fully achieved objectives" (level three) in all other performance categories, and, although Citizens typically barred employees who received a two or below on their performance reviews from inter-department transfers, an exception was made for Tang.

**III.**

Because the record raises a triable issue as to whether Tang suffered sexual harassment and retaliation, the judgment is vacated and the case remanded for further proceedings consistent with this opinion.  Costs are awarded to Tang.

**<u>Vacated and Remanded</u>**.