# United States Court of Appeals
## For the First Circuit

No. 15-1982

KATHLEEN BURNS,

Plaintiff, Appellant,

v.

JEH JOHNSON, Secretary, United States Department of Homeland
Security, Transportation Security Administration,

Defendant, Appellee,

DAVID JOHNSON, Supervisory Air Marshal, in his individual and
official capacities,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Thompson, and Kayatta,
Circuit Judges.

Timothy M. Burke, with whom Jared S. Burke, Sheila E. McCravy, and Law Offices of Timothy M. Burke were on brief, for appellant.
Christine J. Wichers, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief, for appellee.
Monica R. Shah and Zalkind Duncan & Bernstein LLP on brief for Massachusetts Employment Lawyers Association, amicus curiae in support of appellant.

July 11, 2016

**LYNCH**, **Circuit Judge**.  This case arises from plaintiff Kathleen Burns's claims of sex discrimination and sex harassment. Burns worked for over ten years as a Transportation Security Administration ("TSA") employee in the Boston Field Office of the Federal Air Marshals Service ("FAMS"), where her primary role was scheduling international flights for the Federal Air Marshals ("FAMs").  She was considered an "excellent employee," and the scheduling system she in part designed was recognized as a "best practice" for other field offices to follow.

In May 2012, David Johnson assumed the role of Supervisory Air Marshal in Charge ("SAC") at the Boston Field Office and within weeks transferred Burns's flight assignment duties to a group of male employees.  Johnson also spoke to and interacted with Burns in a way that Burns asserts was hostile and unlike his treatment of male employees.  This included Johnson holding a baseball bat in what Burns described as "a swinging position" in almost every interaction with her.

In late June, Burns took early retirement.  She then filed this suit against Johnson and the Department of Homeland Security ("DHS"),[1] alleging, inter alia, violations of Title VII of the Civil Rights Act of 1964.  The district court dismissed

_____

[1]  Burns names as a defendant Jeh Johnson, Secretary, Department of Homeland Security, because TSA is an agency within DHS.  We refer to Jeh Johnson's institutional affiliation, DHS, so as to avoid confusion with defendant David Johnson.

Johnson from the suit and later allowed summary judgment in favor of DHS. On appeal, Burns argues that the district court erred by requiring her to present direct evidence to establish sex discrimination under the mixed-motives theory. We agree with Burns. The district court also erred by requiring her to show that Johnson's conduct was severe and pervasive to establish sex harassment. Furthermore, we conclude that under the correct legal frameworks, there is sufficient circumstantial evidence from which a reasonable jury could find in Burns's favor on both claims. We reverse the entry of summary judgment and remand for further proceedings.[2]

I.

On review of an order granting summary judgment, we recite the facts in the light most favorable to the non-moving party. See Tang v. Citizens Bank, N.A., 821 F.3d 206, 211 (1st Cir. 2016). Many of the facts are not in dispute, and we draw from them accordingly.

Shortly after September 11, 2001, Kathleen Burns began working as a TSA employee in the Boston Field Office of FAMS. Burns was the only female employee in the Operations unit and one of only five non-law enforcement employees in the office. In

---

[2] The Massachusetts Employment Lawyers Association ("MELA") has submitted a brief as amicus curiae in support of the appellant in this case. We acknowledge MELA's assistance.

addition to the FAMs, there were supervisory FAMs ("SFAMs"), two Assistant Supervisory Air Marshals in Charge ("ASACs"), and one SAC, who was in charge of the entire office. Burns was a Program Assistant in Operations and the employee primarily responsible for international flight scheduling. FAM ABC[3] was her "back-up." SFAM James Ouellette was her direct supervisor, and ASAC Timothy O'Connor was her second-line supervisor.

The international scheduling system used in the office was in part Burns's creation. SFAM Ouellette was also involved in the system's creation. ASAC O'Connor stated in an affidavit that inspection teams had on two occasions "noted that international planning and scheduling within [the] office was a 'best practice' for other field offices to follow." SFAM Darin Devine, who was involved with Operations, testified in a deposition to the same. Burns also regularly received high performance evaluations.

Burns spent about seventy-five percent of her time scheduling flights. She worked Thursday, Friday, Saturday, and Sunday from 12:30 p.m. to 9:00 p.m., for a total of thirty-two hours per week. ASAC O'Connor stated in an affidavit that Burns "worked the night shift and filled a lot of holes that others did

---

[3] TSA deemed this case to involve Sensitive Security Information ("SSI"), including the name of the FAM who provided back-up to Burns. We refer to him as "FAM ABC" throughout and omit all other SSI information, none of which is necessary to our decision.

not want to work." Burns preferred this alternative work schedule so that she could care for her five children. Before his arrival, Johnson knew about Burns's role in international flight scheduling, her alternative work schedule, and the reason for it.

On May 7, 2012, Johnson assumed the role of SAC at the Boston Field Office. While in that role, Johnson sometimes carried a Louisville Slugger baseball bat.[4] According to Burns, every time she saw Johnson in the office, he was carrying the bat. Johnson sometimes held an unlit cigar in his mouth.

Two pertinent incidents transpired between Johnson and Burns near the time of Johnson's arrival. During the first, Johnson approached Burns in the Operations office and asked "Who are you?" and "What do you do for me?" After Burns answered, Johnson turned around and walked out of the office. FAM ABC, who witnessed this, described Johnson's tone as "demeaning" and "[n]ot like you would have a typical casual conversation." FAM ABC also testified in a deposition that "[Johnson] never asked [him] that question." The second incident occurred on May 24, 2012, when Johnson approached Burns and commented "so you do still work here." He was carrying the bat. Later that day, again holding the bat,

---

[4] At some point prior to arriving at the Boston Field Office, Johnson was the SAC for a TSA office in Virginia. Johnson is a former Division I college baseball player. When he left the field office in Virginia, his staff gave him as a gift a full-sized baseball bat emblazoned with the office logo.

Johnson approached Burns and said "he had done his homework" at Headquarters on Burns and that although everyone there "spoke very highly of" her and there were no complaints, he had "some concerns" because someone told him that she was sometimes "hard to reach." Burns replied that if a problem arose on her days off, she handled the issue either by e-mail or telephone. Johnson said that he was "not paying [Burns] to work from home." Burns replied that "she never sought compensation for any additional overtime or work she completed outside of her regularly scheduled shifts." After this meeting, Burns told her direct supervisor, SFAM Ouellette, that "she felt uncomfortable" because of "the way [Johnson] spoke with her" and "looked at her," and that she believed Johnson used the bat against her "as a method of intimidation." The parties dispute whether Johnson was aware of Burns's complaints prior to the May 31, 2012, decision to change the international flight scheduling system.

On or before May 31, 2012, Johnson decided to reassign international flight scheduling from Burns to the SFAMs, who were all men. DHS argues that Johnson made this decision for two reasons: first, he wanted to create consistency with other FAMS field offices and, second, he wanted to foster leadership by the SFAMs. On June 13, 2012, during a weekly meeting, Johnson discussed the new scheduling system. Burns was not present. SFAM Ouellette defended the system Burns had in part developed, and

Johnson referred to it as "stupid." At some point Johnson "put his hand up to Ouellette's face as if motioning [him] to stop and stated 'I've done it. I get it.' Johnson then got up and left the room. He returned approximately one minute later and was carrying the baseball bat." He then "turned to face SFAM Ouellette and began to tap the baseball bat between his legs while staring down at SFAM Ouellette." When someone at the meeting asked, "What's the bat for?" Johnson replied, "Things were getting a bit heated in here."

Burns learned about the international flight scheduling change from SFAM Ouellette on May 31, 2012. Burns testified in a deposition that she understood that under the new system she "would be doing the data entry of the [flight scheduling] grid," into which the SFAMs would fill the information themselves. She felt this job would be "degrading" and that "no intelligence [was] needed whatsoever."

After the changes had been announced, in early June, Johnson approached Burns when she was alone in the Operations office. While holding the bat in a swinging position and often tapping it in his hand, Johnson told Burns "how much better things were going to be," including that he would get new carpet for the office. When Burns began to voice a concern about the flight scheduling change, Johnson left the room.

At some point in June, Burns spoke with an Administrative Officer ("AO") about an early retirement program that was being offered. Burns may have also inquired about the availability of early retirement the year before. On June 14, 2012, Burns emailed SFAM Devine that she was retiring, that June 22 would be her last day in the office, and that her retirement would be effective August 1. She made a formal complaint about Johnson to her supervisor, SFAM Ouellette, on June 22; he reported those concerns to Burns's second-line supervisor, ASAC O'Connor; and ASAC O'Connor reported them to Johnson on June 25.

On July 10, 2012, Burns made a complaint to the Equal Employment Opportunity Commission ("EEOC") alleging that "she was discriminated against and subjected to [sic] hostile work environment based on sex (female) and retaliation." She also filed a complaint with the TSA Office of Inspection, leading to an investigation into allegations against Johnson for use of "abusive, offensive, disrespectful, inflammatory or similarly inappropriate language, gesture, or conduct to or about other employees or members of the public"; "[f]ighting, threatening, intimidating, attempting to inflict or inflict[ing] bodily harm on another; harassing or provoking quarrel; engaging in horseplay; any violent, reckless, or disorderly act, language, gesture, or conduct"; and "[l]ack of candor." After a two-and-a-half-month investigation, on November 26, 2012, TSA circulated a report

- 9 -

"substantiat[ing] the above stated allegations" and finding that it was inappropriate for Johnson to carry a baseball bat in the office. TSA did not announce the decision to demote and transfer Johnson to another field office until January 2013 and did not put the transfer into effect until about six weeks after that.[5]

On August 29, 2013, Burns filed a multi-count complaint in federal court, alleging, inter alia, gender discrimination (Count I) and sexual harassment based on a hostile work environment (Count VI). She sought compensatory damages, including for emotional distress, multiple and/or punitive damages, costs and attorney's fees, and equitable relief. The defendants filed a partial motion to dismiss all but Count I, which the court allowed except as to Count VI, on May 8, 2014.[6] See Burns v. Johnson, 18 F. Supp. 3d 67, 76–77 (D. Mass. 2014). After some discovery, DHS moved for summary judgment on all counts on December 5, 2014. On June 18, 2015, the court allowed the motion. Burns v. Johnson,

---

[5] Neither party has challenged the admissibility of the TSA report excerpts or EEOC investigative materials in the record. See Fed. R. Evid. 803(8)(A)(iii); Smith v. Mass. Inst. of Tech., 877 F.2d 1106, 1113 (1st Cir. 1989) (recognizing that "the question of admissibility is one for the discretion of the district court"); see also Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 170 (1988). For the purposes of summary judgment, we accept this concession and cite the contents of the TSA report and the EEOC investigative materials accordingly.

[6] The district court also granted dismissal of all Title VII claims against Johnson. Burns v. Johnson, 18 F. Supp. 3d 67, 72 (D. Mass. 2014). Johnson is not a party to this appeal.

No. 13-CV-12155, 2015 WL 3952748, at *1 (D. Mass. June 29, 2015). This appeal concerns only the sex discrimination and sex harassment claims.[7]

## II.

We review a district court's decision to grant summary judgment de novo, crediting the evidence favorable to the non-moving party, in this case Burns, and drawing all reasonable inferences in her favor. García-González v. Puig-Morales, 761 F.3d 81, 86–87 (1st Cir. 2014). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, "the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Title VII of the Civil Rights Act of 1964 forbids a covered employer from "discriminat[ing] against any individual with respect to [his or her] compensation terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may demonstrate a sex discrimination claim with circumstantial evidence through the

---

[7]    This appeal does not include Burns's claim of constructive discharge, which was brought under Count II, a retaliation claim that Burns does not appeal.

burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and/or by presenting evidence of discrimination on the basis of a prohibited bias under the mixed-motives theory of discrimination.  See Johnson v. Univ. of P.R., 714 F.3d 48, 53 (1st Cir. 2013); Burton v. Town of Littleton, 426 F.3d 9, 19 (1st Cir. 2005).  A plaintiff may also establish a violation of Title VII by showing sex harassment based upon a hostile work environment.  Tang, 821 F.3d at 215; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

Burns challenges the district court's entry of summary judgment against her on her claims of sex discrimination and sex harassment.  We address each claim in turn.

### III.

The district court concluded that Burns's sex discrimination claim failed under the classic McDonnell Douglas framework[8] because she could not show Johnson's conduct was

---

[8]  Under the McDonnell Douglas framework, "[a]n employee alleging sex discrimination must first establish a prima facie case by showing that: (1) she belonged to a protected class, (2) she performed her job satisfactorily, (3) her employer took an adverse employment decision against her, and (4) her employer continued to have her duties performed by a comparably qualified person." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000). The burden of production then "shifts to the employer to state a legitimate, nondiscriminatory reason for the adverse employment action." Id.  If that showing is made, at the final stage, the plaintiff bears the ultimate burden to show that the employer intentionally discriminated against her because of her sex. See id.; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).

motivated by her sex, Burns, 2015 WL 3952748, at *5, and under the mixed-motives theory[9] because she lacked evidence "with a high degree of assurance" of discrimination, id. at *7 (quoting Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (1st Cir. 1999), abrogated by Desert Palace, Inc. v. Costa, 539 U.S. 90, 93-95 (2003)).  DHS argues that Burns also cannot show that she has suffered an adverse employment action and so cannot succeed under either McDonnell Douglas or the mixed-motives framework.

We disagree.  As a threshold matter, it was error for the district court to expect that under the mixed-motives theory Burns had to present direct evidence of discrimination, a standard

---

[9]     The mixed-motives theory -- which applies to cases where multiple motives lie behind an adverse employment action -- was first announced in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) (plurality opinion), and was subsequently codified by the Civil Rights Act of 1991 at 42 U.S.C. § 2000e-2(m).  See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2526 (2013) (describing § 2000e-2(m) as "a lessened causation standard" for establishing discrimination because of sex); Desert Palace, Inc. v. Costa, 539 U.S. 90, 93-95 (2003).  Under the statute, a plaintiff may establish an "unlawful employment practice" by demonstrating that sex "was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  Once a plaintiff shows the existence of an impermissible motivating factor, "the employer has a limited affirmative defense that does not absolve it of liability, but restricts the remedies available to a plaintiff."  Desert Palace, 539 U.S. at 94; see 42 U.S.C. § 2000e-5(g)(2)(B) (If "a respondent demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court -- (i) may grant declaratory relief, injunctive relief . . . , and attorney's fees and costs . . . and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).").

that it invoked by reference to a since-abrogated portion of our decision in Fernandes. Id. (quoting Fernandes, 199 F.3d at 580). "A plaintiff is entitled to prove discrimination by circumstantial evidence alone." Chadwick v. WellPoint, Inc., 561 F.3d 38, 46 (1st Cir. 2009); see also Desert Palace, 539 U.S. at 101-02 (holding that direct evidence of discrimination is not required to obtain a mixed-motives jury instruction). As such, we must consider the circumstantial evidence that Burns has presented under both McDonnell Douglas and the mixed-motives theory. Upon review of the record, we conclude that there is sufficient circumstantial evidence from which a reasonable jury could conclude, first, that Burns suffered an adverse employment action and, second, that the action "was more probably than not caused by discrimination." Chadwick, 561 F.3d at 48.

A.   Adverse Employment Action

DHS argues that Burns cannot show that she suffered an adverse employment action. "An 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace.'" See Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (alterations in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)). The test for whether an employment action is adverse is whether it "materially change[s] the conditions of plaintiffs' employ." Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). The change

"must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Morales-Vallellanes, 605 F.3d at 35 (quoting Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002)). "[R]eassignment with significantly different responsibilities" may be actionable. Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998)).

Burns asserts that the change to international flight scheduling "left [her] with nothing but 'menial tasks' and 'clerical duties.'" We gauge whether such a change is materially adverse "by an objective standard." Id. FAM ABC testified in a deposition that the international flight scheduling for which Burns was responsible was "if not the most important, [the] second most important, in my opinion, aspect of the operations unit." Burns was one of the architects of the system; she had ten years of experience in the office; and she was recognized both inside and outside the Boston Field Office for her work. The reduction transferred seventy-five percent of her responsibilities to others and replaced a system she had in part designed. In these circumstances, a reduction from duties of such importance as those outlined here to performing clerical work is material. Indeed, such changes are more dramatic than those that were accepted as an adverse action in Rodriguez v. Board of Education, 620 F.2d 362 (2d Cir. 1980). There, the Second Circuit found a transfer of an art teacher from a junior high school to an elementary school to

be an adverse action despite no change in salary, workload, or general subject taught, where the plaintiff previously spent many years teaching junior high school students and had graduate degrees in adolescent art education programs. See id. at 364-65; see also id. at 366 (noting the district court's description of the change as a "severe professional . . . trauma").

DHS does not seriously contest the conclusion that if such a reduction had happened to Burns, it would qualify as an adverse employment action. Rather, DHS argues as a factual matter that the new flight scheduling system was only a "future change in her job duties which she did not stay long enough to experience." Burns does not contend that a future adverse employment action is discrimination within the statute's purview. See 42 U.S.C. § 2000e-2(a)(1). Rather, Burns argues that there is sufficient evidence from which a reasonable jury could infer that her job responsibilities decreased significantly before she retired.

We agree with Burns. The record contains deposition testimony from ASAC O'Connor affirming his prior statement in an affidavit that "Burns was basically reduced to clerical duties," and that "[s]he went from having a great deal of responsibility to answering telephone calls from FAMS." SFAM Devine, who was involved with Operations, testified in a deposition that "[Burns] was assigned to menial tasks because all the other planning and whatnot was assigned to other people." From the context in which

those questions were asked, and given the use of the past tense, a jury could reasonably interpret ASAC O'Connor's and SFAM Devine's testimony to show that Burns experienced a reduction in duties shortly following the announcement regarding the transfer of flight scheduling made in late May 2012. Indeed, despite ultimately bypassing the adverse employment action question, the district court specifically credited this testimony as "support[ing] [Burns's] contention that her job responsibilities had decreased significantly." Burns, 2015 WL 3952748, at *4. Burns's own deposition testimony further supports the conclusion that material changes occurred prior to June 22, as does a June 7, 2012, e-mail from SFAM Ouellette to everyone in Operations stating that the SFAMs would return their scheduling grids by July 6, 2012. DHS points to Burns's admission that "[t]he new assignment system was going to be implemented in July 2012, starting with roster #135," and that "[u]p until her last day in the office, June 22, Plaintiff continued to work on international scheduling for rosters #133 and #134." But those admissions are consistent with Burns's duties being significantly reduced before June 22 and announced even earlier. "There is no question . . . that we must resolve all factual disputes in favor of the non-moving party on summary judgment." Tang, 821 F.3d at 218. A reasonable jury could find that Burns's duties were significantly reduced in June prior to her retirement.

DHS argues nonetheless that Burns should have waited to "see how her job duties would shake out starting in July 2012." DHS has offered no evidence about what duties it intended to offer Burns had she stayed. And there is no evidence that after the May 31 decision to transfer Burns's responsibilities elsewhere that DHS ever indicated to Burns what her new responsibilities, if any, would be after the new system went fully into effect in July. The record suggests that things would get worse, not better, especially given that there was no plan for what Burns would do in the long term and Johnson continued to exhibit arguably hostile behavior toward Burns. A reasonable jury could find that Burns had every reason to believe that she would never again reclaim the job directing international flight scheduling and would simply be given menial duties so long as Johnson was her supervisor.

Given these circumstances, a jury could easily find facts sufficient to support the determination that Burns experienced an adverse employment action.

B. Motivation Because of Sex

Burns asserts that a jury could reasonably find that Johnson's decision to change the international flight scheduling system was made "because of" Burns's sex, under both McDonnell Douglas and the mixed-motives theory.[10] 42 U.S.C. § 2000e-2(a)(1);

---

[10] After Desert Palace, this circuit has not required a plaintiff to use McDonnell Douglas with the mixed-motives theory.

see id. § 2000e-2(m). "Our decision here, however, is not dependent on analyzing [her] claim under each of these theories." Chadwick, 561 F.3d at 45. "[U]nder both approaches, 'plaintiffs must present enough evidence to permit a finding that there was differential treatment in an employment action and that the adverse employment decision was caused at least in part by a forbidden type of bias.'" Id. (quoting Hillstrom v. Best W. TLC Hotel, 354 F.3d 27, 31 (1st Cir. 2003)); see Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1235 n.4 (11th Cir. 2016) (noting that "[m]ixed-motive and single-motive discrimination are different theories of discrimination, as opposed to distinct causes of action.").[11] We determine only whether Burns has put forth sufficient evidence from which a jury could decide that the change to international

---

See Chadwick, 561 F.3d at 45; see also Quigg v. Thomas Cty. Sch. Dist., 814 F.3d 1227, 1238-39, 1239 n.8 (11th Cir. 2016) (surveying other circuits' views and noting that our approach is in accord with the approaches of at least four other circuits). To resolve this case, we need not decide whether McDonnell Douglas is available to a plaintiff arguing the mixed-motives theory.

[11] The quoted language in Chadwick did not lessen a plaintiff's burden at the third stage of McDonnell Douglas. See Chadwick, 561 F.3d at 47-48 (analyzing evidence of motive, including pretext); Johnson, 714 F.3d at 54 (stating that at the third stage, "the plaintiff has to show by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory"). The Chadwick court permitted both of the plaintiff's theories to survive summary judgment because she had "put forth sufficient evidence of discrimination that a reasonable jury could conclude that the promotion denial was more probably than not caused by discrimination," Chadwick, 561 F.3d at 48. We employ the same approach here.

flight scheduling "was more probably than not caused by discrimination." Chadwick, 561 F.3d at 48.

Burns has presented evidence that during a meeting about who should be responsible for flight scheduling, the decision-maker, Johnson, questioned why Burns should be in charge of the task and referred to Burns not by name but by the pronoun "she," emphasizing the pronoun, and using a condescending tone. Comments made by the decision-maker close in time to the alleged adverse action can be probative evidence. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000). Johnson's comments were made in the context of a meeting discussing who should be in charge of the flight scheduling. The district court concluded that "[t]he use of the feminine pronoun when referring to a woman, however, hardly suffices to demonstrate gender bias." Burns, 2015 WL 3952748, at *7. But "[t]he speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam) (rejecting an appeals court's requirement that "boy" be modified by a racial classification in order to evince racial bias). Here, a meeting attendee, SFAM Ouellette, stated in an affidavit that Johnson "made frequent references to the way 'she' was doing things. He emphasized the word 'she.'" SFAM Ouellette opined that he "felt it was a condescending way to speak about her and picked up on

- 20 -

[Johnson's] disdain for her and for [Ouellette] when [he] defended her." SFAM Ouellette's observations about Johnson's tone are based on his perception as a seasoned manager on what he had just observed, not mere speculation. See United States v. Flores-Rivera, 787 F.3d 1, 28 (1st Cir. 2015) ("Personal knowledge can include inferences and opinions, so long as they are grounded in personal observations and experiences." (quoting United States v. Rodriguez, 162 F.3d 135, 144 (1st Cir. 1998))); see also Fed. R. Evid. 602. On summary judgment we credit the plaintiff's version of the facts. See Ahmed v. Johnson, 752 F.3d 490, 502 (1st Cir. 2014) ("Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly the task of a jury."); Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 35 (1st Cir. 2001) (crediting plaintiff's description of employer's use of "an offensive 'southern black' accent at meetings" where she was present, despite employer's denial). In these circumstances, a reasonable jury could infer from Johnson's emphasis and condescending tone that he was not motivated by either of his stated reasons, a desire to achieve conformity with the other field offices or to give the SFAMs leadership, but because he disliked that a woman was responsible for the task.[12]

---

[12] Several of Burns's co-workers and supervisors have testified to the same. The district court did not credit their opinions on the grounds that they were speculative and would likely be inadmissible as evidence. Burns, 2015 WL 3952748, at *6. As

DHS counters that there is no evidence "that [Johnson] used sexist or gender-based slurs against Ms. Burns or any other woman." The idea that discrimination consists only of blatantly sexist acts and remarks was long ago rejected by the Supreme Court. See Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51 (1989) (plurality opinion), superseded in part by statute, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071. As this circuit has repeatedly held, stereotyping, cognitive bias, and certain other "more subtle cognitive phenomena which can skew perceptions and judgments" also fall within the ambit of Title VII's prohibition on sex discrimination. Thomas v. Eastman Kodak Co., 183 F.3d 38, 61 (1st Cir. 1999); see Chadwick, 561 F.3d at 43-44. "The ultimate question is whether the employee has been treated disparately 'because of [sex],'" and "[t]his is so regardless of whether the employer consciously intended to base the [adverse employment action] on [sex], or simply did so because of unthinking stereotypes or bias." Thomas, 183 F.3d at 58. As we recently

our decision does not hinge on these opinions, we need not resolve the issue. We also decline DHS's invitation to adopt a broad rule barring all of the witnesses' opinion testimony. This circuit does not categorically bar lay opinion testimony on an ultimate issue. See Fed. R. Evid. 701, 704; Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 347 (1st Cir. 1995) (affirming under abuse of discretion review a trial judge's decision to exclude lay opinion testimony regarding an employer's alleged animus where "the depositions disclosed no evidentiary foundation for an inference of racial animus"). On remand, it would be up to the district court to make an evidentiary determination on a statement by statement basis.

said in Ahmed, "unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus." 752 F.3d at 503 (quoting Thomas, 183 F.3d at 59).

One such stereotype is the idea that men are better suited than women for positions of importance or leadership in the workplace, particularly where the task concerns national security or defense.[13] Johnson testified in a deposition that he intended the change in Burns's duties to give more "leadership" to the SFAMs in the scheduling process. A reasonable jury could find that a sex-based stereotype was behind Johnson's questioning of why "she" was in that role as well as his belief that "leadership" should instead be given to the group of male SFAMs, and that these biased beliefs precipitated the decision to give Burns's duties to a group of men. See Chadwick, 561 F.3d at 47 (concluding that a reasonable

---

[13] See Mary F. Radford, Sex Stereotyping and the Promotion of Women to Positions of Power, 41 Hastings L.J. 471, 492 (1990) ("For women attempting to move into positions of power in the workforce, this basic concept of 'women's work' includes the notion that leadership positions per se are inappropriate for women."); Joan C. Williams & Nancy Segal, Beyond the Maternal Wall: Relief for Family Caregivers Who Are Discriminated Against on the Job, 26 Harv. Women's L.J. 77, 93 (2003) (noting studies demonstrating "glass ceiling problems, namely, that given the close association of 'managers' and 'leaders' with masculinity, subjects tend to dislike women whom they rate highly as managers and leaders because of 'role incongruity' -- the sense that it is incongruous for women to successfully perform masculine roles as opposed to feminine roles"); Kimberly A. Yuracko, Sameness, Subordination, and Perfectionism: Toward A More Complete Theory of Employment Discrimination Law, 43 San Diego L. Rev. 857, 889-90 (2006) (describing research finding that female leaders are evaluated more negatively than men in the same role).

jury could infer from a comment exhibiting sex-stereotyping that the employer took an adverse employment action based on the belief that the "[plaintiff] would not give her all to her job" because she was "a <u>woman</u> with four young children"); <u>Bray</u> v. <u>Marriott Hotels</u>, 110 F.3d 986, 993 (3d Cir. 1997) (suggesting that Title VII should "not be applied in a manner that ignores the sad reality that [discriminatory] animus can all too easily warp an individual's perspective to the point that he or she never considers the member of a protected class the 'best' candidate regardless of that person's credentials"); <u>cf.</u> <u>Lindahl</u> v. <u>Air France</u>, 930 F.2d 1434, 1439 (9th Cir. 1991) ("His comments could suggest that [he] made his decision [to promote] on the basis of stereotypical images of men and women, specifically that women do not make good leaders because they are too 'emotional.'").

Burns's claim that Johnson's decision was motivated by an impermissible bias, and not by his purported reasons, is supported by several additional facts. First, Burns has presented evidence of "incidents and situations which suggest that [Johnson] had a general disregard for [Burns's] professional abilities and status," <u>Thomas</u>, 183 F.3d at 64, despite the complete absence of any factual basis for that disregard. DHS concedes that Johnson "sometimes made comments that were, frankly, tone deaf" and asked questions that were "awkwardly phrased." DHS then argues that despite those remarks, "[t]here is no evidence that Johnson

- 24 -

harbored discriminatory animus against any woman," pointing to Johnson's deposition testimony that he "never doubted [Burns's] performance ever."

The record shows otherwise. FAM ABC's deposition testimony was that when Johnson first met Burns, he approached and asked her "Who are you?" and "[W]hat do you do for me?" in a tone described by FAM ABC as "demeaning." Johnson did not make the same inquiry of or use the same tone with FAM ABC, the male FAM who provided Burns with back-up and who was present when Johnson questioned Burns. A reasonable jury could infer that Johnson questioned Burns and not her male colleague because she was a woman, and that his comment a few weeks later, "so you do still work here," further demonstrated his low regard for Burns as an employee, despite the complete absence of a factual basis for that low regard.

That the comments exhibit a general demeaning of Burns's professional abilities is further supported by the fact that Johnson knew that Burns was the employee primarily in charge of international flight scheduling, and yet there is no evidence that Johnson solicited input or feedback from Burns about his proposed changes to the system. To the contrary, during their conversation in June when Johnson told Burns "how much better things were going to be," when Burns began to voice a concern about the change to international scheduling, Johnson turned and abruptly left the

- 25 -

room.  It is undisputed that he also called the system Burns in part designed "stupid."

And contrary to DHS's assertion that Johnson had no issues with Burns's job performance, there is evidence that Johnson challenged several aspects of her performance.  Johnson admitted that, even before he arrived, he knew about Burns's alternative work schedule, the reason for it, and that he had some "misgivings" about it.  A few weeks later, he said he had "done his homework" on Burns and despite hearing several reports that she performed very well, he nonetheless had "concerns."  There is no evidence that Johnson asked about any other employee's alternative work schedule.

Johnson's negative assessment of Burns's performance is all the more stark when set against the positive evaluations and numerous accolades Burns garnered for her work.  It is undisputed that "[o]ver the course of her employment, [Burns] was categorized as an 'excellent employee' and 'extraordinary' [sic] who received exemplary performance evaluations. . . . [Burns] received numerous letters of commendation from her former SAC at the Boston Field Office."  SFAM Ouellette, her direct supervisor, testified in a deposition, "[s]he was probably[] one of the best employees that I've ever worked with."  And beyond this, the flight scheduling system itself, which Burns in part created, was considered a "'best practice' for other field offices to follow."  A reasonable jury

could find it highly suspect that despite these indicia of high job performance, Johnson persisted in challenging Burns's alternative schedule. See Chadwick, 561 F.3d at 44 ("[T]he assumption that a woman will perform her job less well due to her presumed family obligations is a form of sex-stereotyping and . . . adverse job actions on that basis constitute sex discrimination."). While "[i]t is undoubtedly true that if the work performance of a woman (or a man, for that matter) actually suffers due to childcare responsibilities (or due to any other personal obligation or interest), an employer is free to respond accordingly . . . . [A]n employer is not free to assume that a woman, because she is a woman, will necessarily be a poor worker because of family responsibilities." Id. at 45.

The evidence Burns has presented regarding Johnson's comments and conduct toward her also supports a finding that Johnson "was at times inappropriately upset or angry with [Burns], to the point of behaving unprofessionally." Thomas, 183 F.3d at 64. In Thomas, as here, a long-time employee, Thomas, had received "excellent" performance reviews for many years. Id. at 43. She was the only African-American in her division. Id. at 64. A new white manager, Flannery, gave Thomas significantly lower performance reviews than Thomas had received before and in comparison to her white co-workers, resulting in Thomas being fired. Id. at 45-46. We found it significant to the question of

- 27 -

whether the manager's evaluations were motivated by race that the manager sometimes became "inappropriately upset or angry with Thomas," and we concluded that such evidence "suggests that she did not respond neutrally to Thomas," such that "[a] jury might reasonably infer from Thomas's description of these incidents that Thomas's race was an issue for Flannery and that Flannery's evaluations of Thomas were affected by some form of conscious animus or less conscious bias." Id. at 64. Similarly, here there is sufficient evidence for a jury to conclude that Johnson did not respond "neutrally" to Burns and that Johnson's decisions regarding international scheduling "were affected by some form of conscious animus or less conscious bias." Id.

That conclusion is also supported by evidence that Johnson used a baseball bat around Burns in an intimidating manner. DHS argues that even if the bat was used as a tool of intimidation, Johnson "intimidated men and women alike" and "Burns has not alleged that Johnson treated her as severely as he treated SFAM Ouellette in the June 13, 2012 meeting." But a jury could find the evidence more nuanced than that. At the June 13, 2012, meeting, Johnson left to get his bat only after SFAM Ouellette had defended the scheduling system created in part by Burns and had objected to Johnson's plans. It was at that point, upon returning to the meeting room, that Johnson "turned to face SFAM Ouellette and began to tap the baseball bat between his legs while staring

down at SFAM Ouellette."  When someone at the meeting asked, "What's the bat for?", Johnson replied, "Things were getting a bit heated in here."  A reasonable jury could find that Johnson's disregard for Burns triggered Johnson's conduct.  Likewise, a jury could find that Johnson used the bat as a tool of intimidation in the meeting and infer that he used the bat in that manner at other times with Burns.

A reasonable jury would not be required to draw the inference in DHS's favor that Johnson used the bat in an equally intimidating way against men as he did against Burns.  Contrary to DHS's position, there is evidence that Johnson used the bat with Burns in every interaction after he officially took over, but not constantly with men, and that Johnson used the bat in a manner with Burns that was different from how he used it with men.  Burns testified in a deposition that during one encounter, "[Johnson] banged it on [her] desk in front of [her].  He held it in a very menacing tight grip.  It went from being here, to here, to here, the entire time he spoke with [her]."  Apart from the incident involving SFAM Ouellette, addressed above, DHS has not presented evidence showing that Johnson used the bat in a similar manner and frequency around men as he did with Burns.  Nor has DHS disputed Burns's testimony that during another incident, in which Burns was meeting with an AO to discuss early retirement based on her issues with Johnson, that Johnson "popped out of his office with his

baseball bat" and "proceeded to walk up and down the hallway with his bat in a swinging position."

On this record, a jury could find that "a convincing mosaic of circumstantial evidence" shows that discrimination has occurred. Ahmed, 752 F.3d at 497 (quoting Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012)). That is, a reasonable jury could conclude that the change to international flight scheduling "was more probably than not caused by discrimination." Chadwick, 561 F.3d at 48. We stress "that we are judging merely the claim's viability under summary judgment, rather than as to ultimate liability," id. at 45, and we emphasize that "[w]e only conclude that [Burns] has presented sufficient evidence of sex-based [discrimination] to have her day in court," id. at 48. Our holding rests on the cumulative weight of the points we have made and the evidence presented about Johnson's conduct, comments, and tone toward and regarding Burns, all without any basis in her performance or behavior.

IV.

The district court found that Burns's sex harassment claim failed because the evidence Burns pointed to did not support an inference that Johnson's behavior was "severe and pervasive." Burns, 2015 WL 3952748, at *8 (emphasis added). DHS argues that we can affirm because Johnson's conduct was not sex-based or by accepting the district court's rationale. Alternatively, DHS says

- 30 -

summary judgment should be affirmed because "the Faragher/Ellerth defense precludes the Secretary from being held vicariously liable for the alleged harassment."  We address each issue in turn.

A.    Sex-Based Harassment

DHS argues that there is insufficient evidence that Johnson's behavior toward Burns was based on her sex.  Certain comments by DHS in its brief and at oral argument, where DHS emphasized that in one incident there was no evidence of "anything that would really target her as a woman, that he looked her up and down, or anything like that," lead us to reiterate an important controlling principle.  "[H]arassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); see O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) ("[S]ex-based harassment that is not overtly sexual is nonetheless actionable under Title VII.").  "Courts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct."  O'Rourke, 235 F.3d at 730.  "[S]uch an approach not only ignores the reality that incidents of nonsexual conduct -- such as work sabotage, exclusion, denial of support, and humiliation -- can in context contribute to a hostile

- 31 -

work environment, it also nullifies the harassing nature of that conduct." Id.

We have already explained in the preceding section how Johnson's comments, conduct, and tone about and toward Burns support a reasonable inference that Johnson discriminated against Burns because of her sex. This evidence, which includes Johnson's decision to transfer Burns's duties to a group of male employees, likewise supports the inference that Johnson engaged in "unequal treatment" and "incidents of nonsexual conduct" that a reasonable jury could find to be of a "harassing nature" based on Burns's sex. Id.

DHS focuses on Johnson's frequent carrying of a baseball bat, which DHS points out Johnson did around men and women. However, Johnson's use of the bat in a manner that intimidated men does not preclude the inference that Johnson used the bat in a gender-specific way around Burns. As described previously, Burns has put forth evidence that Johnson used the bat with her in every interaction after he officially took over, but not constantly with men. Burns has testified that Johnson used the bat in a manner that was different from how he used the bat with men. The incident to which DHS points, Johnson's use of the bat around Ouellette, does not suggest otherwise, as a reasonable jury could find that it was Johnson's disregard for Burns based on her sex that triggered his reaction to SFAM Ouellette. Cf. Tang, 821 F.3d at

217 (crediting evidence that a supervisor's yelling at an employee was sex-based where a reasonable jury could conclude it was motivated by a past sex-based interaction).

Moreover, we consider Johnson's use of the bat in the context of the other evidence regarding Johnson's comments, conduct, and tone. In Tang, we explained that "Title VII requires no magic words to convert a verbal exchange into the stuff of sexual harassment." Id. at 216. We noted that "context" matters. Id. There, we found that while Tang's supervisor's "innocuous comment that [he] hired two Thai au pairs, without more, is unlikely to qualify as sexual harassment," "[w]hen viewed in the context of Tang's allegations that [her supervisor] also discussed the purported obedience of Asian women and whether the au pairs' swimwear choices were sufficiently revealing . . . [the supervisor's] statements take on a sexually suggestive tone." Id. In this case, Johnson's bat carrying must be viewed in the context of his other actions and comments toward and about Burns. So viewed, a reasonable jury could find that Johnson used the bat in a way that was different around Burns than other male employees and infer that the difference was sex-based. Given that inference and the other evidence of unequal sex-based treatment, a reasonable jury could find that Johnson's allegedly harassing conduct toward Burns was based on her sex.

- 33 -

B.   Severe or Pervasive

The district court erroneously stated that Burns had to show that the harassment she alleges was both severe and pervasive. Burns, 2015 WL 3952748, at *8 (emphasis added).  That is incorrect. "[T]he conduct must be so severe or pervasive that it 'amount[s] to a change in the terms and conditions of employment.'"  Tang, 821 F.3d at 217 (second alteration in original) (quoting Ponte v. Steelcase Inc., 741 F.3d 310, 321 (1st Cir. 2014)).  "In addition, the 'sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"  Id. (quoting Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008)).  In assessing whether conduct meets these requirements, we consider "the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance."  Id. (quoting Ponte, 741 F.3d at 320).

DHS argues that Johnson's and Burns's schedules did not greatly overlap and that they only had a few conversations over the course of Burns's employment, which, DHS suggests, means that Johnson's conduct cannot be either severe or pervasive.  However, in Tang, we found that even though the supervisor "did not work in the same office as Tang, and Tang's deposition testimony is unclear as to how frequently the[] exchanges took place," id. at 217–18,

- 34 -

because the supervisor "frequented [the plaintiff's] office and acted as the manager of [her group], giving [her] projects and delivering her performance reviews," id. at 218, "we cannot definitively say . . . that [the supervisor's] conduct was not sufficiently severe or pervasive to allow a jury to find in favor of [the plaintiff]," id. (quoting Billings, 515 F.3d at 50). The evidence available in Burns's case is even stronger than the evidence in Tang because every time Burns saw Johnson after he officially took over, he had the bat. Given the facts already described, a reasonable jury could conclude that Johnson's conduct was so severe or pervasive as to constitute harassment.

## C. *Faragher/Ellerth* Defense

Because a reasonable jury could conclude that Burns's supervisor engaged in harassing conduct, there is a basis for employer liability. See Gerald v. Univ. of P.R., 707 F.3d 7, 19-20 (1st Cir. 2013) ("When it is a supervisor that creates an actionable hostile work environment, the employer is vicariously liable."). DHS asserts, nonetheless, that it has met the requirements for the affirmative defense under Faragher/Ellerth. Under that defense, an employer must demonstrate (1) "that its own actions to prevent and correct harassment were reasonable"; and (2) "that the employee's actions in seeking to avoid harm were not reasonable." Chaloult v. Interstate Brands Corp., 540 F.3d 64, 66

(1st Cir. 2008) (citing <u>Faragher</u> v. <u>City of Boca Raton</u>, 524 U.S. 775, 807 (1998); <u>Ellerth</u>, 524 U.S. at 765).

DHS argues that it has met the first prong by having reporting procedures. However, DHS has not shown that it is entitled to judgment as a matter of law on the second prong of this defense. DHS argues that Burns's alleged delay in notifying it of her problems with Johnson was unreasonable because Burns knew about the reporting policy and her explanation for not filing a complaint earlier was illegitimate and unsubstantiated. DHS also argues that her fear was nebulous. But there is evidence in the record that Burns feared retaliation, which is bolstered by the fact that others expressed fear of retaliation for mere participation in the TSA investigation into Johnson. There is also evidence that Burns had earlier reported her concerns, including to her direct supervisor, SFAM Ouellette. It is not our role at summary judgment to assess witness credibility, and we cannot make the inferences in its favor that DHS desires. <u>See</u> <u>Ahmed</u>, 752 F.3d at 502. DHS has not proven that it is entitled to a finding in its favor on this issue.

V.

We <u>reverse</u> the district court's grant of summary judgment on both claims and <u>remand</u> for further proceedings.